[No. S004603. Crim. No. 23452. Feb. 8, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT JACKSON THOMPSON, Defendant and Appellant.

142

COUNSEL

Hugh Anthony Levine, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, John W. Carney, Jr., Jay M. Bloom, Robert M. Foster and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUFMAN, J.*—Defendant Robert Jackson Thompson was convicted of the first degree murder of 12-year-old Benjamin Brenneman, committed on August 25, 1981. He was also convicted of forcible sodomy (Pen. Code, § 286, subd. (c)),[1] lewd conduct with a child under the age of 14 (§ 288, subd. (a)) and felony child endangerment (§ 273a, subd. (1)), presented to the jury as a lesser included offense to a charge of kidnapping. The jury found true two special circumstances: murder during the commission of sodomy (§ 190.2, subd. (a)(17)(iv)), and murder during the commission of a lewd act with a child under 14 (id., subd. (a)(17)(v)). It found untrue a charged special circumstance of murder during the commission of kidnapping.

The original jury was unable to agree on the penalty. (A poll indicated that the jury was divided nine to three in favor of death.) Upon retrial of the penalty phase, a second jury returned a verdict of death. Defendant's appeal under the 1978 death penalty law is automatic. We affirm the convictions and penalty.

I. SUMMARY OF FACTS

Benjamin Brenneman, the victim, was a 12-year-old newspaper carrier for the Orange County Register. His entire route consisted of the Oakwood

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

[1] Unless otherwise indicated, all further statutory citations are to the Penal Code.

Apartments, a complex of several hundred units. Defendant rented apartment 106 in building L.

When Brenneman failed to return home the evening of August 25, 1981, police began a search and discovered his bicycle near building K. One tenant mentioned that she had seen defendant talking with Brenneman earlier in the evening. Police went to defendant's apartment, but discovered no one there.[2] One officer entered the apartment with a key obtained from a security guard, but initially found nothing of help.

About 1 a.m. defendant arrived at his apartment. Defendant acknowledged talking to the newsboy, saying that Brenneman had asked him to subscribe to the newspaper but that defendant did not have the money needed. Defendant consented to a second search of his apartment. This time the police saw a pair of sandals in defendant's bedroom. The police suspected the sandals belonged to Brenneman, a suspicion later verified by Brenneman's mother, who pointed out a special orthopedic lift on the left sandal. Defendant, however, first said they belonged to his girlfriend, Lisa. Told they matched the description of Brenneman's sandals, defendant then said he had found them in the hallway. He denied that Brenneman had been in the apartment, but when officers spoke of checking the apartment for fingerprints, defendant said that Brenneman had waited in the apartment while defendant looked for money for the subscription.

Defendant told the officers that after Brenneman left the apartment, defendant had gone to Huntington Beach to pick up a woman, but had not found one. On the return trip, the muffler fell off his station wagon, and he had spent an hour fixing it. The officers examined the wagon and noticed the muffler firmly in place. They also observed a large empty blue trunk in the back of the wagon.

Defendant voluntarily went to the police station and gave a more complete statement of his activities. He said he had planned to subscribe to the newspaper and left a note in the mailbox to tell the newsboy he could be found in apartment K-104, where he was visiting friends. Brenneman found him there, and the two returned to defendant's apartment. Brenneman noticed that defendant already had that evening's newspaper; defendant said he had bought it at a newsrack earlier. Defendant went to the bedroom to get a $5 bill while Brenneman waited in the kitchen. Brenneman, however, had no change for the bill, so defendant went to his neighbor, Barbara Ieudy, and borrowed $3. Discovering that the subscription cost $4, defendant asked Brenneman to return another day.

---

[2] Police interest in defendant was probably sparked by their knowledge that he was a prior sex offender.

Defendant said that a short while later he discovered the sandals in the hall, picked them up, and left them in his bedroom. He then drove to Huntington Beach. He explained that he lived with his girlfriend, Lisa Hinkle, at an apartment in Redondo Beach; he was very happy with her but wanted to find another woman because he was tired of sex with Lisa every night. Upon returning, defendant had problems with the car's muffler, as he had explained earlier.

The police questioned defendant about drugs or alcohol. Defendant said that he had consumed two drinks that morning and one beer in the afternoon. He occasionally smoked marijuana, but had not done so in the last three to four weeks. The interrogation concluded, and defendant returned to his apartment after promising to call Police Detective Tuttle at noon the next day.

The next morning, three farmworkers discovered the body of the twelve-year-old victim at the base of a road embankment in a rural area of the Palos Verdes Peninsula. Brenneman was wearing shorts and a T-shirt. A rope was looped tightly around his neck four times. One end of the rope passed down the back of his body to bind his ankles, which were pulled up to the base of his buttocks. The other end passed down the front of his body to encircle the ankles. One end of the rope then looped seven times around the victim's wrists, fastening them near the groin.

Medical testimony established the cause of death was ligature strangulation. The testifying doctor stated that the victim was alive when bound. Because each of the strands around the neck was equally tight, he believed strangulation was caused by someone pulling on the rope, but flexion of the body (movement of the legs so as to pull on the rope extending to the neck) could have contributed to the death. The doctor also observed marks caused by manual choking. In his opinion the manual choking preceded the rope strangulation, and was not a cause of death. Sperm was discovered in the victim's anus.[3]

At noon on August 26, 1981, defendant called Detective Tuttle as promised. At the officers' request, defendant rode in a police car with Tuttle and Detective Inns, and took them over the route defendant claimed to have driven the night before. When defendant pointed out the place where he had stopped to fix the muffler, Inns took soil samples and Tuttle told defendant that by microscopic comparison of the samples with soil from defendant's tires they could tell if the vehicle had been at that location. Upon their

---

[3] Tests of the sperm samples were able only to establish limited blood typing factors; they showed that defendant could have supplied the sperm, but the excluded group is less than 50 percent of the male population.

return to the police department, Detective Tuttle asked defendant to telephone him the next day at 4 p.m. Defendant then left the police station. Defendant promptly drove back to the site of the supposed muffler repair and pulled his car off onto the dirt shoulder. He then made a U-turn and returned to his apartment.

The next day, August 27, the police spotted defendant's car in Santa Monica. Lisa Hinkle got in and drove evasively, eluding the police tail. Police suspected, and later confirmed, that defendant was also in the car, crouched down so he could not be observed.

When defendant failed to phone Tuttle at 4 p.m. as agreed, Tuttle called defendant at his place of work. Defendant answered, but when Tuttle identified himself, defendant dropped the phone and left. Tuttle then ordered defendant's arrest. Defendant and Lisa were found at a Santa Monica shopping mall and taken into custody.

Defendant was advised of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and requested an attorney. He was placed in a cell without interrogation. Three days later, on August 30, defendant learned from a jail trusty that Lisa was ill, and might have had a miscarriage. He then asked to speak to Tuttle about getting Lisa out of jail. Defendant's request led to a discussion and interrogation of several hours' duration, during which defendant admitted committing lewd acts with the victim and leaving him bound at the site where his body was discovered. However, he denied killing Brenneman. Facts bearing upon the admissibility of these admissions of defendant are discussed in part III-E of this opinion, *post*, where we consider defendant's challenge to their admission into evidence. We have summarized here only the substance of the admissions.

After several hours, during which defendant became increasingly agitated, defendant asked Detective Tuttle to step out into the hall because defendant believed (correctly) that conversations in the interrogation room were recorded. In the hall, defendant began to cry, and said, " 'I didn't mean to do it. When I left him, he was alive.' "

Back in the interrogation room, defendant asked to see Lisa and expressed concern he would lose her when she learned what he had done. While waiting for Lisa to arrive, defendant said he had "fixed" earlier in the evening of August 25, and that when the victim came into the apartment defendant proposed a sexual relation. Defendant put his arm around Brenneman's shoulders and started to fondle him, but stopped when Brenneman protested. Defendant said he then put the victim in the trunk and carried it

to the car, then returned to the apartment to smoke two marijuana joints. He then drove around aimlessly. At some point during the ride defendant got Brenneman out of the trunk and tied him. Later he stopped the car again. Brenneman said " 'don't kill me.' " Defendant said he would not, and set Brenneman down in some bushes. Defendant denied sodomizing the victim, but later said he was not sure whether he did or not. At this point Lisa arrived and the interrogation terminated.

## II. SUMMARY OF PROCEEDINGS

The district attorney took the matter before the grand jury, which returned an indictment charging murder, kidnapping, forcible sodomy, and lewd conduct with a child under 14. The indictment specified three special circumstances of murder, in the commission, respectively, of kidnapping, sodomy and lewd conduct.[4] Defendant was arraigned in municipal court, which appointed Ronald Brower as his attorney. After a postindictment preliminary hearing before a superior court judge sitting as a magistrate, defendant was held to answer on all charges.

The prosecution presented the evidence set out in the summary of facts in this opinion. The defense presented the evidence of several witnesses. Diana Williams stated that the victim came to her door to solicit a newspaper subscription about 4 p.m. on August 25, and that she saw a man who was not defendant invite Brenneman to come with him and play pool. Ricky Atteberry, a clerk at Linbrook Billiards, testified he saw Brenneman and a man other than defendant at his establishment between 10 and 10:30 that evening. Angela Johnson said she saw a boy similar to the victim, alone in Oakwood Apartments building G about 9:30 p.m.

Defendant then testified on his own behalf. He said he had been drinking heavily on the day of the crime, and had twice injected himself with a "downer." He told of leaving the note for the newsboy, borrowing the $3 from Barbara Ieudy, and returning to his apartment. He then put his arm around the victim's shoulders and asked him if he would like a sexual relationship. Brenneman said "no," and left the apartment. Defendant claimed he did not see Brenneman again. Defendant found the sandals, and kept them because they were in good condition. He testified that he took the empty trunk to his car because he had promised his mother to return it to her, and drove to the beach to try to pick up a woman. He said he had lied to the police initially because he feared getting into trouble because of his sexual advance toward the victim. Defendant testified that he initiated the

---

[4] An amended indictment added the special circumstance of an intentional killing to prevent the victim from testifying as a witness, but that charge was subsequently dismissed on motion of the prosecutor.

conversation of August 30 because he thought he could say something that would get Lisa released from custody, but after hearing the officers' statements about his "[darker] side" and all the evidence against him, he came to believe that he had taken and bound the victim but somehow suppressed the memory.

The jury found defendant not guilty of kidnapping, but guilty of the lesser offense of endangering a child.[5] In all other respects, it found defendant guilty as charged, and found true all special circumstances except that based on kidnapping.

At the penalty trial, the prosecution introduced into evidence a certified copy of a record showing that in 1978 defendant had pled guilty to charges of forcible oral copulation and forcible sodomy. The defense presented expert testimony from Dr. Anderson, a clinical psychologist who said that defendant was an "aggressive pedophile," that he did not receive adequate treatment for this condition when imprisoned for prior offenses, and that he should never have been released from prison. Dr. Takamine, a physician specializing in alcoholism and drug abuse, testified defendant was an alcoholic, and described the general effects of alcohol abuse, including the potential to exaggerate the characteristics of other diseases, and the release of inhibition or ability to control behavior. He also noted defendant's history of problem drinking and blackouts.

Defendant testified that during his childhood his father would insist that defendant drink with him, and then when they were both drunk would force him to engage in sexual acts. John Mayes, a minister, said he had counseled defendant's father about his drinking problem and had heard that the father had abused defendant sexually.

The jury divided nine to three for death, and was unable to reach a verdict. The trial court declared a mistrial, and ordered a new penalty trial.

Before the retrial, Ronald Brower asked to be relieved as counsel for defendant. He explained to the judge in camera that he had developed such an intense dislike of defendant that he could not properly represent him. The judge granted the motion and appointed Michael Haron to represent defendant in the penalty retrial.

At the penalty retrial, the prosecutor presented substantially the same evidence as in the original guilt trial, but introduced substantially more

---

[5] The prosecutor had suggested at closing argument that defendant was not guilty of kidnapping if the victim had been killed in the apartment, and defendant had transported only a dead body to Palos Verdes.

penalty evidence. In addition to proving defendant's 1978 conviction, the prosecutor called David B., the victim of those crimes. David B. testified that when he was 13 years old defendant drove him to a park, offered him a beer, then put a knife to David B.'s neck and forced him to engage in acts of sodomy and oral copulation. Glen Allen, the sheriff who investigated the David B. case, testified that defendant first denied the crime, then made a series of statements, each admitting a little more of the charges. The prosecutor also introduced into evidence documentary proof of defendant's 1967 conviction of child molestation.

The defense called Dr. Anderson, Dr. Takamine, and Reverend Mayes, who testified as they did at the first penalty trial. In addition, Dr. Takamine described how some alcoholics have blackouts and cannot thereafter remember what they did during the period of blackout. Defendant did not testify. The defense also called its investigator, Thomas Gleim, who was permitted to testify that defendant had given helpful advice to a fellow prisoner, Richard Melnyk, on how best to adapt to prison life. However, the court declined to permit counsel to introduce into evidence through Gleim two letters written by defendant to Melnyk and a letter from Melnyk to defendant.

The jury on retrial returned a death verdict. The trial court denied the statutory motion for modification of verdict.

III. ISSUES RELATED TO DEFENDANT'S GUILT TRIAL

A. *Superior court jurisdiction to conduct a postindictment preliminary hearing.*

█ Defendant, indicted by the county grand jury, requested a postindictment preliminary hearing. The judge presiding at the arraignment in superior court assigned another superior court judge to sit as magistrate and conduct the hearing. That judge conducted the hearing, and bound defendant over for trial on all charges. The district attorney then filed an information identical to the amended indictment, and defendant was rearraigned on both the information and amended indictment.

Defendant's right to a postindictment preliminary hearing derives from *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916]. We concluded in *Hawkins* that "[i]f [an indicted] defendant makes a timely request for such a [postindictment] preliminary hearing, at the direction of the court the prosecuting attorney shall refile the indictment as a complaint, thus activating the procedures set forth in the Penal Code (see Pen. Code, § 859 et seq.)." (22 Cal.3d at p. 594.) The cited procedures

provide for a preliminary hearing before a magistrate. Generally, preliminary hearings are conducted before a municipal court judge sitting as a magistrate.

Defendant argues that the court and prosecuting attorney did not comply with *Hawkins* in that the prosecutor did not refile the indictment as a complaint and the preliminary hearing was held in superior court. He maintains that upon the filing of a request for a postindictment preliminary hearing the indictment becomes *"functus officio"* (*Martinez* v. *Superior Court* (1980) 106 Cal.App.3d 975, 978 [165 Cal.Rptr. 267]) and the state cannot proceed against him until it files a complaint with the municipal court. He concludes that the superior court lacked jurisdiction to conduct the postindictment preliminary hearing and, consequently, that he was not properly bound over for trial.

Our decision in *Hawkins* v. *Superior Court, supra*, 22 Cal.3d 584, was concerned with assuring that indicted defendants receive the same rights and protections as other defendants. Defendant received the preliminary hearing required by *Hawkins*. He points out that persons charged by complaint in municipal court have other statutory rights not specifically accorded indicted defendants, such as rights to discovery of police records (§ 859) and to a speedy hearing (§ 859b), but does not claim he was denied such rights. He asserts no prejudice arising from the procedure employed in this case, and admits he raised no objection to that procedure below.

Thus, defendant is reduced to arguing that the procedure described in *Hawkins* is not only mandatory, but "jurisdictional," that jurisdiction cannot be conferred by consent or lack of objection (cf. *People* v. *Schoeller* (1950) 96 Cal.App.2d 61, 62 [214 P.2d 565]), and that absence of jurisdiction is reversible without a showing of prejudice (cf. *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941]). Our decision in *Hawkins* v. *Superior Court, supra*, 22 Cal.3d 584, however, did not limit the jurisdiction of the superior court. The filing of the indictment confers jurisdiction on that court (see § 737), and neither the indictment nor the consequent jurisdiction evaporates when the defendant requests a postindictment hearing. ▮ The judge who presides over the preliminary hearing, whether he is a municipal court judge or a superior court judge, does so in his capacity as a magistrate, not as a judge of a particular court. (*Koski* v. *James* (1975) 47 Cal.App.3d 349, 355 [120 Cal.Rptr. 754].) ▮ We conclude that despite the absence of a new complaint, the superior court retained the fundamental jurisdiction to proceed against the defendant. While for the sake of uniformity it may be desirable for the district attorney to follow the procedure described in *Hawkins, supra*, 22 Cal.3d 584, and file a new complaint, the failure to do so is not jurisdictional.

B. *Exclusion of the public from jury voir dire.*

■ Defendant argues that he was deprived of his constitutional right to public trial when the judge at defendant's first trial conducted the portion of the voir dire relating to jurors' views on capital punishment in chambers.

In *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 69 [168 Cal.Rptr. 128, 616 P.2d 1301], we observed that the death-qualification portion of the voir dire had usually been conducted in open court so that each venire person was heard by the others. We found some problems with this procedure, including its tendency to focus on the penalty phase of the proceeding, possibly causing the jurors to anticipate guilt. (*Id.* at p. 70.) Therefore, to minimize the problems we perceived, we held the "portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration. This rule will not in any way affect the open nature of a trial." (*Id.* at pp. 80-81, fn. omitted.) To comply with *Hovey*'s mandate, the court in defendant's original trial conducted the death-qualification voir dire in chambers. Neither the public nor the press was present, although there was no specific order excluding them. No member of the press or public asked to be present, and neither party objected to the procedure.

Shortly after the trial of this case, the United States Supreme Court held in a "free press" case that there is a presumption that jury voir dire is to be conducted in open court, which presumption "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (*Press-Enterprise Co.* v. *Superior Court of Cal.* (1984) 464 U.S. 501, 510 [78 L.Ed.2d 629, 638, 104 S.Ct. 819].) The court further determined that the interest to be served must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." (*Ibid.*)

In *People* v. *Turner* (1984) 37 Cal.3d 302, 316, footnote 4 [208 Cal.Rptr. 196, 690 P.2d 669], we left unresolved the effect of *Press-Enterprise* upon the procedures required by *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1.[6] We also have no occasion on the facts of this case to decide the question reserved in *Turner,* in the absence of any request by the media or the public to witness the voir dire proceedings.

---

[6] *Press-Enterprise, supra,* 464 U.S. 501, would not affect *Hovey*'s ruling, *supra,* 28 Cal.3d 1, that each juror be questioned concerning his or her views on capital punishment in isolation from other jurors. (*Ukiah Daily Journal* v. *Superior Court* (1985) 165 Cal.App.3d 788, 792 [211 Cal.Rptr. 673].) In the penalty phase retrial the judge followed that procedure, conducting voir dire of each juror in open court but without other jurors present.

In both *Press-Enterprise, supra,* 464 U.S. 501, and *Ukiah Daily Journal, supra,* 165 Cal.App.3d 788, excluded media members objected to sequestered voir dire. Consequently, both cases focused on the right of the media; the *Press-Enterprise* court specifically prefaced its discussion by stating that it focused upon the rights of the press under the First Amendment, not the right of the defendant to a public trial under the Fifth Amendment. (*Press-Enterprise, supra,* 464 U.S. 501, 509, fn. 8 [78 L.Ed.2d 629, 638].) In the present case neither the media nor any representative of the public asked to witness the voir dire.

We are therefore concerned solely with the right of a defendant to a public trial.[7] ▮ It is well settled that this right may be waived by the failure to assert it in timely fashion. (*People* v. *Hines* (1964) 61 Cal.2d 164, 172 [37 Cal.Rptr. 622, 390 P.2d 398]; *People* v. *Moreland* (1970) 5 Cal.App.3d 588, 595-596 [85 Cal.Rptr. 215]; *People* v. *Cash* (1959) 52 Cal.2d 841, 846 [345 P.2d 462]; *People* v. *Teitelbaum, supra,* 163 Cal.App.2d 184, 207.) ▮ Defendant now complains that prior to the *Press-Enterprise* decision of 1984 (*supra,* 464 U.S. 501), counsel would not realize he had any basis to object to sequestered voir dire. Defendant's argument overstates the matter, for the question of press access to voir dire was a matter of active litigation in 1983. In any event, the sequestered voir dire was ordered by the judge primarily for the benefit of the defendant, and under the circumstances of this case it is doubtful that any competent defense counsel would have objected to it.

C. *Exclusion of jurors because of views on capital punishment.*

▮ Defendant claims that the exclusion from the jury of persons who would automatically vote against the death penalty denied him a representative jury. This contention was rejected by this court in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680] and subsequently by the United States Supreme Court in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].

D. *Excusing jurors for hardship.*

▮ Defendant claims that his federal and state constitutional right to a jury representing a fair cross-section of the community (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 528 [42 L.Ed.2d 690, 696, 95 S.Ct. 692]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748]) was

---

[7] A defendant has both a constitutional and a statutory right to public trial. (Cal. Const., art. I, § 15; Pen. Code, § 686, subd. 1.) Proceedings for the impanelment of the jury are included within the term "public trial." (*People* v. *Teitelbaum* (1958) 163 Cal.App.2d 184, 206 [329 P.2d 157].)

denied when the trial judges at both the original trial and the penalty retrial allowed approximately half the venire to be excused on hardship claims without any inquiry into the basis of the claim.[8]

In *People* v. *Fields, supra*, 35 Cal.3d 329, we considered whether or not a jury was unrepresentative of the community because persons opposed to capital punishment were excluded for cause from the guilt phase of the trial. We held that since the excluded group was not a cognizable class, defendant had failed to establish that the jury did not represent the community.

Defendant quotes *Fields* for the proposition that "the equal protection clauses of the United States and California Constitutions bar the arbitrary exclusion of any person or groups of persons from jury service, whether or not they comprise a cognizable class." (*People* v. *Fields, supra*, 35 Cal.3d at p. 350.) In *Fields*, we noted that "persons who would automatically vote against the death penalty routinely serve on California noncapital cases, and all parties and amicus alike assume that such persons could not constitutionally be excluded. The question before us, in terms of equal protection— and of the right to a representative jury, if that right can be asserted on behalf of a noncognizable group—is whether the state can justify excluding this group from the guilt phase of death penalty cases." (*Id*. at pp. 350-351.) We went on to discuss the state's justification for excluding "guilt phase includables" from the guilt phase of the trial (see *id*. at pp. 351-352) and upheld the state's justification as resting on a rational basis. (*Id*. at p. 352; see also *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1214-1215 [255 Cal.Rptr. 569, 767 P.2d 1047].)

Although we do not necessarily approve of the procedure adopted by the trial court for granting hardship exemptions, we cannot find it lacks a rational basis. The court recognized that the trial would be lengthy and that the time required for jury selection alone might impact unreasonably on certain jurors. In an effort to save time, the judge chose a procedure he thought expedient. As in *People* v. *Fields, supra*, 35 Cal.3d 329, at page 350, the jurors were excused only from this case, not excused from jury duty altogether. Finally, prior to proceeding in this fashion, the trial judge spoke

---

[8] The trial judge in the original trial told the prospective jurors: "So, what we are going to do now and so forth—and again, if you will examine your conscience because, as I said, it's difficult to get jurors to serve beyond the—I think you only have to serve ten days and so forth, actual trial days. Plus, as I said, many of you will be going over into the first week in March. So, I don't want any of you, as I said, to have business or financial or personal problems which would interfere. [¶] So, what I am going to do now—and don't everybody stand up at once—I'm going to have you basically just state your name and your panel number. . . . And just indicate that you have a hardship problem, and the attorneys have agreed they are not going to make any inquiries. But I will put you on your word. You have been sworn."

with counsel to determine whether there was any objection.[9] Neither counsel objected. We cannot say that the court's action was unreasonable under these circumstances.

### E. *Admissibility of defendant's incriminating pretrial statements.*

#### 1. *The interrogation of August 30.*

As stated earlier, defendant received word from a jail trusty that Lisa, his girlfriend, was ill and might have miscarried. Defendant asked to speak to Detective Tuttle about the matter. Tuttle readvised defendant of his *Miranda* rights. Defendant acknowledged his rights, but said he wanted to talk about "[c]ertain things. . . . I want to talk to you [be]cause I want Lisa to get out of here." Tuttle said he shared defendant's concern; he knew Lisa had a history of nervous breakdowns, and that she thought she had miscarried. He then explained that "I couldn't release her the other day . . . because the fact [*sic*] that you didn't want to talk to me, and . . . all I had to go by was what she told me."

Defendant spoke of his love for Lisa and started to cry. Tuttle left to get coffee and Kleenex. When he returned he said to defendant, "the thing is, Bobby, you know, I'm not totally convinced that she doesn't know something about this. . . . I'll have to present the case to . . . the D.A.'s office and it's going to be up to them to make the determination as to whether or not she stays . . . . [I]nformation hasn't come forward at this time which would cause me to release her. See what I'm saying?"

A few minutes later, Tuttle said to defendant, "I think if you truly loved her, you wouldn't allow her to sit here in jail if you knew information that would help her. See what I'm saying? . . . [I]f the D.A.'s decide to prosecute and she's found guilty, . . . that could really push her over the edge.

---

[9] The judge in the original trial told counsel in camera: "So we have it on the record, gentlemen, what I was going to do is have a hundred prospective jurors, and what I thought I'd do is bring them in and basically introduce counsel and Mr. Thompson to the prospective jurors and then read the information. And then what I am going to do is indicate, as I said, that I'll assume this will be about a four-week trial, give or take a few days, and just find out who is in a position to not serve, which is putting it in the double negative, but just inquire as to what jurors cannot serve in a protracted case of this type, and basically be pretty loose as far as excusing them. I was going to not make too much of an inquiry in that regard. In other words, if they have a business or hardship problem, excuse them.

"So, what I want to do is indicate to you, gentlemen, if in fact you want to make some inquiry along that line as far as the court releasing each juror. But I think, as I said, the best I can do is ask them if they can serve, basically, for that period of time.

"Is there any objection as far as either side for that procedure? Mr. Brower?

"MR. BROWER [defense counsel]: There's no objection.

"MR. ENRIGHT [prosecutor]: No objection, Your Honor."

I'm not saying it will, Bobby, I'm just, you know, I think we should explore all possibilities . . . . You're what's important to her more than anything in the world right now. And I think . . . if she is incarcerated . . . it could really break her. Up to this point, I don't really have any reason . . . to release her. Like I told you before, . . . unless something else comes forward that can show that she's totally uninvolved. You know what I'm saying?"

Defendant replied: "I was told by the Public Defender . . . not to talk at all. . . . I don't even think I should be talking now . . . . And I agreed with him." He and Tuttle then discussed whether defendant would be represented by the public defender or a private attorney.

Tuttle then changed the subject, and asked defendant about his infected finger. This led to a discussion about defendant's job, which led to a discussion about his activities generally. Tuttle then asked defendant, "How come you went back to the beach, Bobby?" This question related directly to the crime, since, as the detective suspected, defendant returned to the beach because he had previously told the police falsely that he had been there, and wanted to make sure that beach soil was on the tires of his car. Defendant replied, "[I was] [s]cared, because of my past record."

Tuttle then asked defendant about the trunk, which defendant had returned to his mother's house. He questioned defendant about his use of drugs and alcohol, pointing to numerous inconsistent statements. Defendant replied that he had initially denied use because to admit use of drugs or alcohol would be to admit a parole violation.

Reminding defendant that the victim's body was found in Palos Verdes, Tuttle challenged defendant: "How do you explain your tires over there, Bobby? We got a nice plaster cast of your front tires over there. How do you explain that?" In fact, the police had no plaster casts, and as yet nothing to connect defendant with the site where the body was found.

Defendant denied going to Palos Verdes, and continued to assert that he was not a killer. Tuttle then inquired, "What if there's another side . . . to Robert Thompson?" Defendant responded, "I do not know. I don't know. I don't think there is. . . . [I]f there is, God help me. Please, help me . . . if there is. [Bec]ause I love Lisa. . . . And if there's another side to me, help me." Tuttle asked if there was a possibility that defendant sometimes blacked out and did not remember what he did. Defendant said, "Yes, there is. . . . I'm scared at those times." They reviewed defendant's actions on the night of the murder, but this time defendant said he had been drunk and did not remember everything. Tuttle asked if defendant might have commit-

ted the crime and forgotten it; defendant said, "I don't think I did." Tuttle asked defendant to assume he had done it, and explain how it happened, but defendant refused.

Officer Johnson then took over the interrogation. After asking defendant a number of questions ranging over various subjects, he announced, "I don't believe in bullshitting around and also I'm gonna tell you the way it is." He then informed defendant that his car had been tied in to the place the body was found, and that the blue trunk contained physical evidence linking it to the victim. Both assertions were false. Johnson continued, stating that he believed defendant had tied the victim as part of a sexual "trip" and killed him unintentionally.

Discussion turned to defendant's apartment, and defendant admitted that the victim had brought the newspaper found in the apartment. Johnson claimed, falsely, that the police had found rope fibers in defendant's bedroom and, truthfully, that a witness had seen defendant carrying the trunk out of the apartment the evening of the crime. Johnson concluded that while he thought the defendant killed the victim unintentionally, "[W]e'll see you in court, and I can tell you we're going with the . . . theory right now that you killed him so you wouldn't get identified. . . . You remember everything you do, the only question is whether you want to talk about it, and it's obvious that you don't want to talk about it. So I'm wasting my time and I'm wasting your time."

Defendant, however, immediately said he wanted to continue the conversation. At this point Tuttle returned to the room and showed defendant a photograph of the body. Johnson again reviewed the claimed evidence, true and false, against defendant, asserted that if defendant did not talk the police would proceed on the theory of an intentional killing, and then left the room.

Tuttle turned to defendant and asked, "Why did you do it?" Defendant asked him to step into the hall because he believed the conversations in the room were recorded. In the hall, defendant began crying and said, " 'I didn't mean to do it. When I left him, he was alive.' " Tuttle described defendant's appearance: "He was crying profusely. He was shaking. He was having a hard time supporting himself on his feet. He was being assisted by Detective Johnson and myself."

Defendant and the detectives went back into the interrogation room, where defendant said that he proposed a sexual act to the victim and touched him. ■ ■ ■ ■ ■ Defendant also admitted leaving the

bound victim by the road.[10] Defendant continued to maintain that the victim was alive when defendant left him.

## 2. *Waiver of the right to counsel.*

When defendant was arrested, he asserted his right to counsel, and the police then refrained from interrogating him. Defendant subsequently spoke to two attorneys from the public defender's office, who advised defendant not to discuss the crime with the police. Defendant agreed to follow this advice. As of August 30, however, defendant had apparently not been arraigned and no attorney had yet been appointed to represent him.

Defendant now contends that his incriminating statements on August 30 were inadmissible because he did not waive his previously asserted right to counsel. He presents three arguments: (1) that the police "initiated" that portion of the discussion which led to the statements; (2) that the *Miranda* warnings given at the onset of that discussion were defective; and (3) that during that discussion he again asserted his right to counsel, but that assertion was ignored by the interrogating officers. We consider each of these arguments.

■ In *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386, 101 S.Ct. 1880], the United States Supreme Court held that once an accused has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to

---

[10]The parties frequently refer to defendant's statement as a confession, but the Attorney General claims that it is actually an admission. "[A] confession [amounts] to a declaration of defendant's intentional participation in a criminal act, whereas an admission is merely the recital of facts tending to establish guilt when considered with the remaining evidence in the case." (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) A confession must encompass all elements of the crime. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Fuentes* (1967) 253 Cal.App.2d 969, 975 [61 Cal.Rptr. 768]; *People* v. *Beverly* (1965) 233 Cal.App.2d 702, 712-713 [43 Cal.Rptr. 743].) Tested by these definitions, defendant's statement constituted a confession of the offense of lewd conduct with a child under 14, but not a confession of sodomy. It falls short of a confession of premeditated murder because defendant denied he intended to kill the victim. It falls short of a confession of felony murder because defendant did not acknowledge a causal relationship between his conduct and the victim's death.

The only significant distinction between a confession and an admission is that the improper introduction of a confession is reversible per se (*People* v. *Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114]), whereas the wrongful introduction of an admission is not reversible if the People can show beyond a reasonable doubt that the error did not contribute to the verdict. (*People* v. *Murtishaw, supra,* 29 Cal.3d 733, 756.) In the present case, defendant's statements were an important part of the prosecution case; without it, the prosecution would have only circumstantial evidence that might not persuade a jury beyond a reasonable doubt of defendant's guilt. Thus, under either standard the admission into evidence of defendant's statements, if error, would probably require reversal of the conviction.

him, unless the accused himself *initiates* further communication, exchanges, or conversations with the police." (Italics added.) Subsequently in *Oregon* v. *Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405, 103 S.Ct. 2830], the court examined the concept of "initiation" of a conversation. Bradshaw had invoked his right to counsel. Later, while being transported from the police station to jail, he asked an officer, " 'Well, what is going to happen to me now?' " The officer explained the charges and the procedures involved, and then suggested to Bradshaw that he might help himself by taking a polygraph examination. Bradshaw agreed, and the unfavorable results led him to confess.

The plurality opinion by Justice Rehnquist stated: "There can be no doubt in this case that in asking, 'Well, what is going to happen to me now?', respondent 'initiated' further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. . . . [¶] Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that '[y]ou do not have to talk to me,' and only after the accused told him that he 'understood' did they have a generalized conversation. [Citation.] On these facts we believe that there was not a violation of the *Edwards* rule." (*Oregon* v. *Bradshaw, supra*, 462 U.S. at pp. 1045-1046 [77 L.Ed.2d at pp. 412-413].) The plurality concluded the defendant validly waived the right to have counsel present at the interrogation.[11]

In the case at bench defendant initiated a conversation about Lisa in the hope that he could get her released from jail. When Detective Tuttle explained he could not talk unless defendant solicited the conversation,

---

[11]Justice Powell, concurring, thought that a knowing and voluntary waiver of the right to counsel would suffice to uphold the confession even if the police initiated the discussion. Justice Marshall and the other three dissenters argued that Bradshaw's inquiry concerned only the place and conditions of confinement, and did not open discussion concerning the crime itself.

defendant responded that he wanted to talk about "[c]ertain things." The detective repeated the *Miranda* warnings, obtained a waiver, and began a conversation about Lisa. After a few minutes, the conversation turned to the subject of defendant's injured finger, then to defendant's job, and eventually to the crime itself.

Defendant's request to talk about Lisa was not an innocuous request, comparable to asking for a drink of water. Lisa was under arrest as an accessory after the fact, and police willingness to release her depended on her noncomplicity in the crime. Defendant's request for Lisa's release might reasonably be met with a suggestion that defendant discuss the crime to show Lisa's noninvolvement. Following the analysis of *Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, we conclude that while defendant's initiation of the conversation may be said to have been ambiguous in that it did not make clear his willingness to engage in a generalized discussion of the crime, it could reasonably be interpreted by the officer as opening a generalized discussion, and that the officer understood the request in that light. On these facts, the officer did not violate defendant's constitutional rights by engaging in a generalized discussion of the crime, after first obtaining a knowing and voluntary waiver of the right to have counsel present.

 This brings us to defendant's second *Miranda* argument. Before discussing Lisa, and defendant's activities relating to the crime, Detective Tuttle told defendant, "You have the right to consult with an attorney, to be represented by an attorney, and to have an attorney present before and during any questioning. If you cannot afford an attorney, one will be appointed by the court free of charge . . . to represent you if you desire." Defendant acknowledged that he understood those rights, and with those rights in mind, was willing to talk to Tuttle.

Defendant now argues, however, that the warning was defective in that it did not make clear defendant's right to have *appointed* counsel present during questioning. Counsel reasons that defendant was told of his right "to be represented" by an attorney and "to have an attorney present . . . during questioning" as separate rights, then told of his right to have an attorney appointed "to represent you," but not of his right to have appointed counsel present during questioning.

An essentially identical argument was rejected by the United States Supreme Court in *California* v. *Prysock* (1981) 453 U.S. 355 [69 L.Ed.2d 696, 101 S.Ct. 2806]. Prysock was told that " '[y]ou have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. . . . [Y]ou have the right to have a lawyer appointed to represent you at no cost to yourself.' " (*Id.* at

pp. 356-357 [69 L.Ed.2d at pp. 699-700].) A California Court of Appeal held the warnings insufficient because they did not make clear defendant's right to have a lawyer appointed before the impending questioning. The United State Supreme Court reversed, saying that defendant "was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. These warnings conveyed to respondent his right to have a lawyer appointed if he could not afford one prior to and during interrogation. The Court of Appeal erred in holding that the warnings were inadequate simply because of the order in which they were given." (*Id.* at p. 361 [69 L.Ed.2d at p. 702].) On remand, the Court of Appeal held that the warnings also complied with California constitutional law. (*People* v. *Prysock* (1982) 127 Cal.App.3d 972 [180 Cal.Rptr. 15].)

The warnings in the present case are virtually identical with those in *Prysock, supra*, 453 U.S. 355. The defect claimed by defendant is the same in substance as in *Prysock*: Prysock said he was not told he had a right to have counsel appointed before the interrogation; defendant says he was not advised of the right to have appointed counsel present at an interrogation. In both cases the plain import of the language used in delivering the *Miranda* warnings refutes the contention. (See also *Duckworth* v. *Eagan* (1989) 492 U.S. __, __ [106 L.Ed.2d 166, 178, 109 S.Ct. 2875, 2880-2881].)

 Finally, defendant argues that he invoked his right to counsel during the discussion and, that upon his doing so, the officers were under a duty to stop the interrogation. He points to two passages. In the first, defendant said the public defender had advised him not to talk at all. He added that "I don't even think I should be talking now. . . . [He told me] not to say nothin' about the case or anything, unless I had a lawyer present. . . . And I agreed with him." Later defendant again recalled that he was told not to say anything, and "[y]ou know, and, like I'm just going to go with what, you know, what the lawyer said because I . . . . What else can I say, well, really. I don't want to see her here."

It is true a request for counsel need not be unequivocal to invoke the defendant's right to call a halt to questioning. (See *People* v. *Randall, supra*, 1 Cal.3d 948, 955.) Defendant cites cases which have held equivocal language sufficient to curtail questioning. (See *People* v. *Russo* (1983) 148 Cal.App.3d 1172, 1176 [196 Cal.Rptr. 466] [" 'I don't know if I should have a lawyer here or what' "]; *People* v. *Munoz* (1978) 83 Cal.App.3d 993, 995 [148 Cal.Rptr. 165] [" 'Well, maybe I should talk to my attorney' "].) In context, however, defendant's statements were not even an equivocal assertion of the right to counsel, but only an explanation of why he was willing to proceed without counsel. In fact, twice when the officers spoke of

terminating the discussion, defendant insisted on continuing it. Defendant did not want the discussion to stop. The statements defendant relies on were intended to communicate only that, despite the advice he had received from the public defender, he was willing to talk in the hope of obtaining Lisa's release.

3. *Voluntariness of defendant's statements.*

■ Our decision in *People* v. *Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93] explained the mode of appellate review when the voluntary character of incriminating statements is in issue. We said, "This court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' " (*Id.* at p. 835.) The prosecution bears the burden of proof, and in cases arising prior to the enactment of article I, section 28, of the California Constitution, must prove voluntariness beyond a reasonable doubt. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672]; but see *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042] as to the current standard of proof [post-Prop. 8].)

■ "The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735].)" (*People* v. *Hogan, supra,* 31 Cal.3d at p. 841.) In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041].)" (*Ibid.*)

■ While recognizing that our decision must be based on the totality of the circumstances (*People* v. *Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74]), defendant calls our attention to certain aspects of the interrogation which, he contends, show the involuntary character of his incriminating statements.[12] First, he points out, the police

---

[12] Defendant also cites *People* v. *Azure* (1986) 178 Cal.App.3d 591 [224 Cal.Rptr. 158] [disapproved as to the standard of review applied in *People* v. *Markham, supra,* 49 Cal.3d 63, 71, fn. 4], in which the appellate court found a defendant's confession involuntary as a matter of

repeatedly lied to him in an attempt to convince him that further denial of guilt was hopeless. Specifically, the interrogating officers falsely told him that his car had been connected with the scene of the victim's death by tire tracks and soil samples, that they had found physical evidence linked to the victim in defendant's car and the trunk, and that they had found rope fibers in defendant's bedroom.

Numerous California decisions confirm that deception does not necessarily invalidate a confession. We note in particular *In re Walker* (1974) 10 Cal.3d 764 [112 Cal.Rptr. 177, 518 P2d 1129], in which a wounded defendant was told, perhaps deceptively, that he might die before he reached the hospital and should talk to close the record, and *People* v. *Watkins* (1970) 6 Cal.App.3d 119 [85 Cal.Rptr. 621], in which a defendant was falsely told that his fingerprints had been found on the getaway car. In both cases the confession was admitted on the ground that "the deception was not of a type reasonably likely to procure an untrue statement." (*In re Walker, supra*, 10 Cal.3d at p. 777; see *People* v. *Watkins, supra*, 6 Cal.App.3d at p. 125.)

In *People* v. *Hogan, supra*, 31 Cal.3d 815, we said at pages 840 to 841: "While the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary [citation], such deception is a factor which weighs against a finding of voluntariness [citations]." Hogan, confronted with false statements purporting to show his guilt of murder, came to doubt his own sanity, and confessed in response to a police offer to get him help for his alleged mental condition. We held the confession inadmissible, not on account of the deception, however, but because of the promise to defendant of help if he confessed. We did note the effect of deception in making more plausible the police offer to obtain help for Hogan's mental condition. (*Id.* at p. 841.)

The present case has some factual resemblance to *People* v. *Hogan, supra*, 31 Cal.3d 815. Here, as in *Hogan*, the police falsely told defendant of incriminating evidence that would tend to prove him guilty, then suggested that defendant had blackouts, and might have forgotten that he committed the crime. In *Hogan*, however, our holding was ultimately grounded upon the police promise to obtain help for Hogan if he confessed; there was no comparable promise in the present case.

■ Next, the defense points to Detective Tuttle's statements that, despite her medical problems, Lisa would not be released until defendant

---

law. That finding, however, was based largely on repeated statements by the interrogating officers that the interrogation would not stop until the defendant had told the truth. The officers questioning defendant in this case said nothing to suggest that he could not have terminated the interrogation whenever he wished.

discussed the crime. (See *ante,* pp. 159-160.) He relies on *People v. Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], a case in which the police indicated to defendant Trout that if he confessed, his wife would be released to take care of their children. (They also conveyed this message to the wife, then permitted her to talk to Trout.) We held that "[w]hether or not there were express threats or promises making Mrs. Trout's release from custody dependent upon defendant's confessing to the crimes, the undisputed facts . . . show that such a *threat or promise* to defendant was implied. . . . We are satisfied that the confession resulted from improper pressure by the police and should not have been received in evidence." (*Id.* at p. 585, italics added.)

The Attorney General relies in turn on Court of Appeal decisions in *People v. Abbott* (1958) 156 Cal.App.2d 601 [319 P.2d 664] and *People v. Jackson* (1971) 19 Cal.App.3d 95 [96 Cal.Rptr. 414]. The *Jackson* court explained *Abbott* and *Trout*: "[In *Abbott*], as here, defendant's wife (albeit common law) was also taken into custody because she was living with defendant; there, as here, the officer told defendant that if the latter told the truth and there was no evidence to hold his wife, she would be released. The court observed that 'the officers made it clear to defendant that Miss Bell would not be prosecuted if their investigation failed to disclose evidence of her guilt, but this was not a threat to prosecute her if defendant did not confess the crime nor a promise to release her if he did. The fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of another person who is suspected of complicity in the offense does not render the confession involuntary.' (P. 605.) Likewise, as here, 'The officers believed that [defendant], and he alone, could implicate her or exonerate her. In justice to her it was their duty to learn, if they could, whether her further detention was warranted and this required the interrogation of [defendant]. If he felt himself under pressure to make a statement it came from the conditions he had created which placed Miss Bell under suspicion. If he made the statement willingly it was, in a legal sense, voluntary.' (P. 605.) . . . Unlike *People v. Trout, supra,* 54 Cal.2d 576, 583-584, upon which defendant relies, there were no inducements nor, of course, were there any threats. At most there was a simple statement of fact by the officer that defendant's wife would be released if further investigation convinced him and his superiors that she had no connection with the crime despite the suspicious circumstances which defendant . . . had created." (19 Cal.App.3d at pp. 99-100.)[13]

---

[13]*Jackson* also distinguished *Trout* on the ground that in *Trout* the police had no reasonable grounds for the detention of defendant's wife. (*People v. Jackson, supra,* 19 Cal.App.3d at p. 100; compare *People v. Trout, supra,* 54 Cal.2d at p. 584.)

In the present case, Lisa was apparently arrested as an accessory after the fact, based upon evidence that she had helped defendant evade police surveillance. Section 32 defines an

The line between a threat (or a promise) and a statement of fact or intention can be a fine one. In this case, Detective Tuttle began by saying that he was not convinced of Lisa's innocence, that the district attorney would have to decide whether to release her and that "[I]nformation hasn't come forward at this time which would cause me to release her. See what I'm saying?"—statements which seem clearly proper. Succeeding statements, however, were somewhat more problematic and could have been understood to convey that defendant's refusal to confess was responsible for Lisa's incarceration. Tuttle said, "I think if you truly loved her, you wouldn't allow her to sit here in jail if you knew information that would help her. See what I'm saying?" After that comment Tuttle referred to Lisa's fragile mental condition, and suggested that further incarceration could "really break her." He then added, "Like I told you before . . . unless something else comes forward that can show that she's totally uninvolved. You know what I'm saying?"

We are impressed, however, by the fact that defendant did not make his incriminating statements until several hours after the conversation had turned from Lisa to other subjects. During that period defendant twice declined the interrogators' suggestion that the discussion stop, telling the police, on the second such occasion, "I'd rather continue." From this fact the trial court concluded, and reasonably so, that defendant's incriminating statements were not induced by any implied threat or promise made hours earlier.

■ Finally, defendant argues that he was impelled to confess by the threat that, if he did not, he would be subject to the death penalty. Confession induced by the threats of prosecution for a capital crime have been held inadmissible. (See, e.g., *People* v. *McClary, supra,* 20 Cal.3d 218, 229; *People* v. *Hinds* (1984) 154 Cal.App.3d 222, 238 [201 Cal.Rptr. 104] and cases there cited.) However, here the death penalty was not mentioned by the interrogators. What they said was that they had two alternative theories of the crime—an accidental killing and an intentional one to prevent

accessory after the fact as one "who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony . . . ." (See *People* v. *Duty* (1969) 269 Cal.App.2d 97, 104 [74 Cal.Rptr. 606] [supporting false alibi]; *People* v. *Ellenberg* (1958) 165 Cal.App.2d 495, 501 [331 P.2d 1053] [concealing gun used in robbery].) Lisa's action in helping defendant evade the police might qualify her as an accessory if she knew defendant had committed a felony. (Defendant was not yet charged with a felony.) Since the conduct itself suggests guilty knowledge (*People* v. *Duty, supra,* 269 Cal.App.2d at p. 104), the police had probable cause for Lisa's arrest.

In this case Lisa was eventually released without charges. She did not testify at either the original trial or the penalty retrial.

identification—and that "we're going . . . with the theory right now that you killed him so you wouldn't get identified." Defendant, of course, might have feared that an intentional killing would be punished more severely than an unintentional one. But it seems unlikely that fear of otherwise receiving a death sentence induced his confession, for shortly afterwards he asked the officers what would happen to him, and surmised: "Probably get the gas chamber won't I?"

■ Moreover, it is settled that " '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." (*People* v. *Jimenez, supra,* 21 Cal.3d 595, 611-612, quoting in part *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) The circumstances of the crime here suggested alternative theories of accidental or intentional killing and, absent evidence refuting one theory, both would likely be asserted. The police did not promise to abandon the theory of intentional killing if defendant confessed, and in fact the prosecutor tried the case on the alternative theories. We find, in short, neither threat nor promise, but simply an accurate statement of the circumstances.

Our task in this pre-Proposition 8 case is, as stated earlier, to determine whether defendant's incriminating statements were voluntary beyond a reasonable doubt. After reviewing the record and listening to the recording of the interrogation in the present case we are convinced they were. The tone of the interrogation was restrained and noncoercive. Although defendant may have begun the conversation in the hope of bringing about Lisa's release, he continued it, raising no objection as it moved from subject to subject and finally centered on the crime. Even then, given the opportunity to end the discussion, he chose to continue. Finally, in response to Tuttle's question, "Why did you do it Bob?" defendant retained sufficient presence of mind to request to go outside the room because he believed conversations in the room were recorded. And once in the hallway, he said nothing about Lisa's release, about the evidence against him or the possibility of a killing during a blackout; the incriminating statements instead came as an emotional catharsis.

Defendant's incriminating statements were properly admitted into evidence.

F. *Sufficiency of the evidence to show forcible sodomy.*

■ Defendant attacks the sufficiency of the evidence to show forcible sodomy on three grounds: he questions the evidence of sodomy, the

evidence that the act occurred when the victim was alive, and the evidence that force was employed. The finding of sperm in the victim's anus is in itself sufficient evidence of sodomy. The medical evidence indicated that the victim was bound while alive, and was killed by pulling on the ropes. The manner of the tying would render an act of sodomy impossible after the victim was tied. Hence, the evidence is ample that the victim was sodomized before he was bound, when he was still alive.[14]

The evidence for the use of force is likewise ample. Marks on the boy's neck showed forcible manual choking, and the victim when found was bound hand and foot.

### G. *Sufficiency of the evidence of felony murder.*

The trial court instructed the jury on felony murder, as murder "committed in the perpetration of . . . any act punishable under Section 288." (§ 189.) Section 288 prohibits a lewd or lascivious act with a child under 14. Defendant argues that the only lewd and lascivious act here is sodomy, and that the evidence shows no nexus between the sodomy and the victim's death. Defendant is mistaken in his claim that the only lewd act is sodomy. Defendant testified that he put his arm around the victim's shoulders and attempted to fondle him. Since his conduct was done "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person [the actor] or [the] child", it violated section 288, subdivision (a).

The only nexus required is that the felony and the killing be part of a continuous transaction. (See *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Chavez* (1951) 37 Cal.2d 656, 669-670 [234 P.2d 632]; *People* v. *Atkins* (1982) 128 Cal.App.3d 564, 568 [180 Cal.Rptr. 440].) In this case the lewd act and the killing occurred during the same evening, probably within one or two hours. During this entire period, the victim was under defendant's control, and for much of the time was either bound, locked in a trunk, or both.

In *People* v. *Fields, supra,* 35 Cal.3d 329, the defendant robbed the victim, then drove her some distance from his home to kill her. We found a felony murder, noting that the crimes were linked not only by defendant's motive—which, as here, may have included preventing the victim from identifying him to the police—but also by his "continued control over the

---

[14] Defense counsel suggests that the victim could have been bound, strangled, untied to permit the act of sodomy, then retied. The retying of the victim, in this scenario, would require exacting care, since the placement of the ropes would have to match exactly the marks left by the earlier binding.

victim." (*Id.* at p. 368.) Even if, in the present case, one or more lewd acts occurred at defendant's apartment, perhaps another (the sodomy) elsewhere and the killing some hours later in Palos Verdes, defendant's control over the victim was continuous and links the crimes.

### H. Overlapping charges of sodomy and lewd conduct.

 Defendant argues that he cannot be convicted of both sodomy under section 286, subdivision (c), and lewd and lascivious conduct under section 288, subdivision (a). He relies on *People* v. *Greer* (1947) 30 Cal.2d 589 [184 P.2d 512] for the proposition that section 654 barred the conviction of a defendant for lewd conduct with a child under 14 and statutory rape when both charges were based on the same act.[15] The relevant language in *Greer,* however, was rejected by this court in *People* v. *Pearson* (1986) 42 Cal.3d 351 [228 Cal.Rptr. 509, 721 P.2d 595]. Section 654, we explained, prohibits only multiple punishment, not multiple conviction. *Pearson* expressly held that a defendant who committed an act of sodomy on a child could be convicted of both sodomy and of lewd conduct. (42 Cal.3d at p. 358.)

### I. Overlapping convictions for lewd conduct and child endangerment.

 The case was submitted to the jury at the guilt trial with an instruction describing false imprisonment as a lesser included offense of the charged offense of kidnapping. The next day the court withdrew the instruction on false imprisonment and substituted one on child endangerment.[16] Apparently the court gave the new instruction because it had previously instructed at defendant's request on second degree felony murder, which requires a felony not listed in section 189 that is inherently dangerous to life. The court then realized that false imprisonment would not qualify as an inherently dangerous felony (*People* v. *Henderson* (1977) 19 Cal.3d 86, 90 [137 Cal.Rptr. 1, 560 P.2d 1180]), and therefore substituted child endangerment.

---

[15] Section 654 provides, in relevant part, that "[a]n act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

[16] Child endangerment is described in section 273a, subdivision (1), which provides that "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment. . . ."

Defendant complains that the court should have instructed the jury that it could not convict defendant of child endangerment based upon the same conduct as that underlying the charges of sodomy or lewd conduct. For the reasons explained in the previous section of this opinion, part III-H, *ante*, that contention is erroneous; section 654 only prohibits multiple punishment, not multiple conviction. The court here stayed the sentence on child endangerment in favor of the sentence upon the charge of lewd conduct, thus avoiding multiple punishment and complying with section 654.

### J. *Juror note-taking.*

In *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161], we advised it was the "better practice" for the court to admonish the jurors concerning taking notes during trial.[17] At defendant's guilt trial, the judge told the jury that while they were free to take notes, "don't lose the flavor of the trial by ending up being a secretary and trying to take every word down." The judge at the penalty retrial gave no admonition concerning note-taking.

However, the failure to give an admonition on note-taking is not a problem of constitutional dimension. A defendant has the burden of showing prejudice, and defendant here has not attempted to meet that burden. The record does not disclose how many jurors, if any, took notes, and there is no reason to believe that practice had any effect upon the outcome of the trial. We conclude that the omission resulted in no prejudice to defendant. (See *People* v. *Silbertson* (1985) 41 Cal.3d 296, 303-304 [221 Cal.Rptr. 152, 709 P.2d 1321].)

### K. *Presence of the judge in the jury room.*

Shortly after the jury retired to deliberate, the judge noticed that he had failed to provide a verdict form for the lesser included offense of attempted lewd conduct. After notifying counsel, he entered the jury room, explained his mistake, and gave the verdict form to the jury. This was improper. Any private communication between judge and jury is improper.

---

[17] " ' . . . [Jurors] should not permit their note-taking to distract them from the ongoing proceedings; that their notes are only an aid to their memory and should not take precedence over their independent recollection; that those jurors who do not take notes should rely on their independent recollection of the evidence and not be influenced by the fact that another juror has taken notes; and that the notes are for the note taker's own personal use in refreshing his recollection of the evidence. The jury must be reminded that should any discrepancy exist between their recollection of the evidence and their notes, they should request that the record of the proceedings be read back and that it is the transcript that must prevail over their notes.' " (*People* v. *Whitt, supra*, 36 Cal.3d at p. 747, quoting *People* v. *DiLuca* (1982) 85 A.D.2d 439 [448 N.Y.S.2d 730, 735].)

(*Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 7 [22 Cal.Rptr. 649, 372 P.2d 641]; *People* v. *Alcalde* (1944) 24 Cal.2d 177, 189 [148 P.2d 627].)

However, under any standard of prejudice the impropriety here was harmless. The omitted verdict form and the judge's unreported comments to the jury related only to the distinction between lewd conduct and the lesser included offense of attempted lewd conduct. The distinction between actual and attempted lewd conduct was immaterial to the murder conviction under the felony-murder rule (see § 189) and to the special circumstance of felony murder (see § 190.2, subd. (a)(17)). The distinction was relevant only to count 2 of the indictment, defendant's conviction for lewd conduct with a child under 14. Since defendant testified to an actual lewd touching (see *ante*, p. 152), and the jury found him guilty of sodomy, there is no reason whatever to believe that absent the judge's improvident conduct the jury would have rejected the verdict of lewd conduct and found only attempted lewd conduct.

L. *Presence of court reporters in the jury room.*

■■■ When the jury requested the reading of certain testimony, the judge informed counsel that it was his practice to have the court reporter go to the jury room and read the requested testimony without the judge, counsel or defendant present. The reporter would be instructed to read the testimony verbatim, and not to answer questions. Counsel stipulated to this procedure, and on two occasions reporters went into the jury room and read testimony.

Defendant now suggests that the jury might have deliberated while the reporter was present—since nobody expressly told them not to—and that the presence of an unauthorized person during jury deliberations is reversible error. (See *People* v. *Britton* (1935) 4 Cal.2d 622 [52 P.2d 217, 102 A.L.R. 1065] [alternate juror present]; *People* v. *Adame* (1973) 36 Cal.App.3d 402 [111 Cal.Rptr. 462] [same].) However, the record before us contains nothing whatever to indicate the jury engaged in deliberations while either reporter was present, and the suggestion it did is no more than unsupported speculation of no consequence whatever. ■■■ The same is true of defendant's contention that the jurors improperly made use of a dictionary. The record shows only that the bailiff discovered that the jurors had a dictionary and took it; he asked if they had used it and was told "no." If the dictionary had remained, perhaps the jurors would have used it, but the presence of an unopened dictionary does not amount to misconduct.

■■■ Defendant also argues he had a right to be personally present when the reporters read the testimony to the jury, and that defense counsel could

not waive that right. He cites *Diaz* v. *United States* (1912) 223 U.S. 442, 455 [56 L.Ed. 500, 505, 32 S.Ct. 250], which stated that a capital defendant is incapable of waiving a statutory right to be present at every stage of the trial, and *Bustamante* v. *Eyman* (9th Cir. 1972) 456 F.2d 269, 274, which held that a capital defendant could not waive his right to be present for the replay of a taped instruction to the jury.

In *People* v. *Robertson* (1989) 48 Cal.3d 18 [255 Cal.Rptr. 631, 767 P.2d 1109], however, we considered whether a capital defendant could waive his right to be present. We there concluded, contrary to the cases cited by defendant, that "[i]f a capital defendant may waive counsel to his detriment, and if other felony defendants may waive their right to presence at various stages of trial [citations] and at sentence [citations], we see no sufficient reason not to permit a capital defendant to waive the right to be present as well. Our statutes governing waiver make no distinction between capital and other felony defendants [citations]; unless and until the United States Supreme Court should determine the federal Constitution requires it, we decline to impose such a distinction as a matter of state constitutional law." (*Id.* at pp. 61-62.)

*Robertson* left undecided the question whether defense counsel alone can waive defendant's right to be present. The answer, we believe, should turn on the nature of the proceeding. When, as here, the proceeding is one in which defendant and his counsel have no significant role—the verbatim reading of testimony previously heard by the jury—we see no reason why counsel should not be able to make the waiver on his client's behalf. "We are unpersuaded that such a practice encroaches in any way on the 'fullness of [defendant's] opportunity to defend' his case. (*Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 105-106 [78 L.Ed. 674, 678, 54 S.Ct. 330, 90 A.L.R. 575].)" (*People* v. *Odle* (1988) 45 Cal.3d 386, 407 [247 Cal.Rptr. 137, 754 P.2d 184].)

M. *Instructions on the felony-murder special circumstance: failure to instruct on intent to kill.*

*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] held that proof of intent to kill or aid a killing was essential to a finding of felony-murder special circumstances under the 1978 death penalty initiative. However, defendant's present crimes were committed and his trial occurred before the *Carlos* decision was filed, and the jury was not given an instruction requiring a finding of intent to kill. Defendant argues that the court's failure to give such an instruction was reversible error. Not so. In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] this court overruled *Carlos.* We held that a first degree felony

murderer who did the actual killing is subject to the death penalty even if he did not intend to kill.

N. *Instructions on the felony-murder special circumstance: immediate flight after commission of the felony.*

 Relying on *Jones* v. *Superior Court* (1981) 123 Cal.App.3d 160 [176 Cal.Rptr. 430], defendant contends that under the 1978 death penalty law a murder committed while defendant was engaged in the commission of a felony, and one committed when he was engaged in the immediate flight after committing the felony, fall under two different special circumstances. Since the indictment and information charged only murder during the commission of sodomy and lewd conduct, defendant argues that the court erred in instructing on murder during the immediate flight after committing such felonies. He further contends that the court should have instructed the jury that it must agree on whether the murder occurred while defendant was engaged in committing the felony, or during flight thereafter.

In *People* v. *Guzman* (1988) 45 Cal.3d 915, 950-952 [248 Cal.Rptr. 467, 755 P.2d 917], however, we rejected the reasoning of *Jones, supra*, 123 Cal.App.3d 160, and held that the 1978 law's special circumstance of murder "while engaged in" the commission of a felony was no less broad than the 1977 death penalty law's special circumstance of murder "during" the commission of a felony. Since under the 1977 law the underlying felony continues while defendant maintains control over the victim (*People* v. *Fields, supra*, 35 Cal.3d 329, 368), the charges in the present case included the scenario in which defendant committed the felonies, then maintained control over the victim until the time of the actual killing. Consequently, the court did not err in instructing on immediate flight as part of the charged special circumstance, or in failing to require the jurors to agree on whether the murder occurred while defendant was engaged in the commission of the felonies or during flight.

IV. ISSUES RELATING TO THE PENALTY RETRIAL

A. *Defendant's motion to avoid a second penalty trial.*

 After the first jury was unable to reach a penalty verdict, defendant asked the judge not to set the case for retrial, but to enter a judgment of life imprisonment without possibility of parole. The court denied the motion, stating that it had no discretion in the matter. Its decision is supported by the language of section 190.4, subdivision (b), which provides that "[i]f the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and *shall order a*

*new jury impaneled* to try the issue as to what the penalty shall be. If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole." (Italics added.) The fact that the statute specifically gives the court discretion to enter a sentence of life imprisonment without possibility of parole after a second deadlock makes it clear that the emphasized language mandates a retrial after a first deadlock.

### B. *Notice of aggravating evidence.*

■ Section 190.3 provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. . . ."

Before the original trial began, the prosecution furnished defendant with a written notice which specified various aggravating evidence, but did not include defendant's 1967 conviction for child molestation. At the first penalty trial the prosecution attempted to introduce the 1967 conviction, the defense objected, and the judge excluded the evidence.

Before the penalty retrial the prosecution filed an amended notice which included the 1967 conviction. The court denied defendant's motion to strike the amended notice, and at the penalty retrial the prosecution presented documentary proof of the conviction. Defendant contends this was error.

Not so. As this court explained in *People v. Robertson, supra*, 48 Cal.3d 18, 45-46: "The meaning of 'trial' varies depending on the context of its use. (See generally *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [lead opn. of Broussard, J.], 902-903 [dis. opn. of Grodin, J.; Lucas, J. and Panelli, J., conc.] [231 Cal.Rptr. 213, 726 P.2d 1288].) . . . Where the question of notice arises in the context of the initial trial in which the guilt and penalty phases occur in immediate sequence and thus are part of a unitary proceeding, we have construed 'trial' as the whole proceeding; hence notice must be given in advance of the guilt phase. (*People v. Miranda* (1987) 44 Cal.3d 57, 96-97 [241 Cal.Rptr. 594, 744 P.2d 1127].) Where, however, as here, the notice issue arises in the context of a second trial—i.e., a 'retrial'—. . . 'trial' must reasonably be construed to mean the judicial proceeding in which the matter in issue is again examined and resolved. Only this construction serves both the evident purpose of the notice provision—viz., 'to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial' (*Miranda, supra*, at p. 96 [1978 law])—and the overriding purpose of section 190.3

that the jury 'be made aware of all of the factors bearing on the penalty decision' (*People* v. *Jennings* [(1988)] 46 Cal.3d [963,] 987 [251 Cal.Rptr. 278, 760 P.2d 475] [1978 law]). We conclude, therefore, that the 'trial' to which former section 190.3 refers embraces the original trial, as defined above, or the retrial, be it of the entire proceeding or the penalty phase only."

The amended notice in advance of the penalty retrial was proper; defendant's motion to strike was properly denied and proof of the 1967 conviction was properly received.

### C. Informing the second jury of the first jury's deadlock.

Defendant cites *People* v. *Carmichael* (1926) 198 Cal. 534, 542-546 [246 P. 62],[18] in which this court held that at a second trial defense counsel could voir dire the prospective jurors to determine whether they knew the vote of the first jury. Defendant contends that the court at his penalty retrial was required, sua sponte, to determine whether defendant desired to inform the new penalty phase jury of the vote of the deadlocked jury at the first penalty trial and, if so, to so inform the new jury.

The contention is devoid of merit. *Carmichael* gave defendants no right to inform a retrial jury of the vote of the first deadlocked jury, only a right to voir dire the new jury panel to find out if they had such knowledge, suggesting that such knowledge might make them biased or prejudiced. (*People* v. *Carmichael, supra*, 198 Cal. 534, 545; see also *People* v. *Williams* (1981) 29 Cal.3d 392, 403, fn. 4 [174 Cal.Rptr. 317, 628 P.2d 869].) It would be incongruous in the extreme to hold the court is required to impart to the new jury the very information the *Carmichael* court indicated might make it biased. The fact that a first jury deadlocked, or the numerical vote of the first jury, is irrelevant to the issues before the jury on a penalty retrial.

### D. Peremptory challenges to Black jurors.

After the jury for the penalty retrial had been selected and sworn, defendant moved for a mistrial on the ground that the prosecutor had used peremptory challenges to remove all Blacks from the jury panel. (The parties stipulated there were four Black persons on the venire, that one had been excused for cause, and that the prosecutor had asserted peremptory challenges against the other three.) The court denied the motion. Defendant contends he was deprived of a representative jury. The Attorney General

---

[18]Overruled on other grounds in *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659].

contends the trial court noted good reasons for the prosecutor's excusing the Black jurors and that in any event the court properly denied defendant's motion because it was untimely.

It is of course true that the use of peremptory challenges to remove jurors on grounds of racial or other group bias is prohibited under both the federal and California Constitutions. (*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People* v. *Wheeler, supra*, 22 Cal.3d 258.) However, a motion attacking the use of peremptory challenges must be raised in "timely fashion." (*People* v. *Wheeler, supra*, 22 Cal.3d at p. 280; *People* v. *Ortega* (1984) 156 Cal.App.3d 63, 69-70 [202 Cal.Rptr. 657].) For the reasons stated in *People* v. *Ortega, supra*, we hold a motion for mistrial based on a claim of discriminatory use of peremptory challenges, first asserted after the jury has been sworn, is too late.[19]

E. *The testimony of David B.*

■ In 1978, defendant pled guilty to oral copulation and sodomy of a minor under the age of 14. The prosecutor presented documentary evidence of the conviction, then called the victim, David B., to testify. The testimony showed that before committing the sexual acts, defendant threatened David B. with a knife, drove him to a remote location, and compelled him to drink tequila and beer and to smoke marijuana. Defendant contends the jury was thus permitted to consider evidence of uncharged nonviolent crimes (furnishing alcohol and marijuana to a minor) and violent crimes of which he

---

[19] In holding a motion after the jury is sworn is untimely, *Ortega* explained: "In our opinion, it is necessary that a *Wheeler* objection be made at the earliest opportunity during the voir dire process for several practical reasons.

"First, an early objection will facilitate the moving party's counsel in making the best possible prima facie case. Second, an early objection will place the opposing party on notice so that counsel may consider whether and on what basis to continue using peremptories against cognizable group members and to prepare to make the best explanation feasible. Third, an early objection will alert the court so that it can intelligently rule on the questions of prima facie case and, if one is found, explanations. In other words, this procedure will insure that the court will pay close attention to the questions asked of and answered by the jurors and other matters bearing on the use of peremptory challenges. The longer a party waits to make a *Wheeler* motion the less feasible it will be for the court to recall specific questions and answers and the demeanor of the jurors.

"Fourth, this procedure will promote the efficient and economic administration of justice by permitting the court, if it finds discrimination in the use of peremptory challenges, to dismiss the existing jury panel and obtain a new panel without having to wait until the selection process has been completed.

"Finally, this procedure will help the courts and parties achieve the most fair and correct result, both below and on appeal. For example, in a case where one party is systematically excluding blacks, it is necessary that the record reflect that a challenged juror is, in fact, black. It is also important that the record reflect when no more blacks are left on the jury panel." (*People* v. *Ortega, supra*, 156 Cal.App.3d 63, 69-70.)

was not convicted, and that the error was exacerbated by the court's failure to instruct that the jury could only consider charges of which he had not been convicted if proved beyond a reasonable doubt.

Defendant is wrong on all counts. The court instructed the jury: "You may, *if you find them to have been proved beyond a reasonable doubt,* consider the evidence which has been presented of, one, the defendant's alleged 1967 conviction for violating Penal Code section 288; two, the defendant's alleged 1978 conviction of violating the Penal Code sections 288, oral copulation, and 286, sodomy, with respect to [David B.]; three, the alleged criminal activity involving the kidnapping and the assault with a deadly weapon upon [David B.]. *You may not consider as evidence in aggravation any other evidence of alleged criminal or violent conduct except these above enumerated items.*" (Italics added.)

The prosecution is generally entitled to inform the jury of the circumstances of any prior violent criminal activity through testimonial evidence, whether or not the defendant was convicted of a crime. Thus, if a defendant has been convicted of a prior crime, the prosecution is not limited to documentary proof of the conviction, and need not accept a stipulation barring testimonial evidence. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 754-757 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].) The one notable statutory limitation is found in section 190.3, which bars proof of the commission of a crime for which a defendant was tried and acquitted.[20] Defendant makes no claim he was acquitted of kidnapping or assault with a deadly weapon in the 1978 proceeding.

The challenged evidence was properly admitted and the court's instructions were not erroneous.

F. *Defendant's letters to Richard Melnyk.*

 While in jail awaiting trial, defendant became friends with Richard Melnyk, a 22-year-old man facing incarceration for burglary. Defendant gave him useful advice on how to adapt to prison life. When Melnyk was transferred to Soledad Prison, the two continued to correspond.

Defense counsel subpoenaed Melnyk as a penalty phase witness, but Melnyk told counsel that he feared attacks from other prisoners if he testified on behalf of a child murderer. Counsel decided not to call Melnyk, but

---

[20] *People* v. *Melton, supra,* 44 Cal.3d 713, 755, also held that a failure to file charges, or a dismissal pursuant to a plea bargain, does not bar the prosecution from introducing evidence of the crimes in question.

requested that he be permitted to introduce testimony from Thomas Gleim, a defense investigator who had talked to Melnyk. The court permitted Gleim to testify that Melnyk told him that defendant had given him valuable advice on how to conduct himself in prison, and been a positive influence on him.

Defendant also asked to introduce two letters from defendant to Melnyk and one from Melnyk to defendant. The court refused to admit the letters written by defendant on the ground that they were hearsay, and defendant would be "talking to the jury through a letter . . . [and] not subject to cross-examination." Defendant now asserts that the court's refusal to admit those letters was error. The Attorney General claims that the letters were properly excluded because they were written with a view to their presentation at trial.

The contentions of the parties concerning these letters are not properly before us. The letters were not marked for identification and are not part of the record, nor was any offer of proof made as to their content. Since the letters were excluded on hearsay grounds the prosecutor had no occasion to develop on the record evidence to support the claim the letters were written for presentation at trial. From the discussion of the parties we can only infer the letters might have furnished cumulative evidence similar in substance to the testimony of defense investigator Gleim, in which case there is no reasonable possibility their exclusion could have changed the outcome of the trial.

G. *Admissibility of photographs at penalty phase.*

Defendant contends that the trial court erroneously admitted gruesome photographs depicting the victim in death, because they served no purpose other than to create an emotional impact on the jury adverse to defendant. The contention is not meritorious.

The prosecution sought to admit three photographs at the penalty phase, one depicting the back of the victim's neck with the rope intertwined around the neck and two photographs showing the victim's face and neck where the rope had cut into the neck. The court admitted two of the photographs and excluded one.

Defendant contends (1) the only possible relevancy these photographs could have would be to establish intent, which he asserts was not in issue at the penalty phase, and (2) the trial court failed to exercise its discretion by weighing the risk of undue prejudice against the probative value of the photographs. The latter contention is based on the fact that the court did

not expressly state on the record that it in fact weighed undue prejudice against probative value.

Defendant's first contention fails for several reasons. The court expressly instructed that defendant's intent could be considered by the jury in determining aggravating and mitigating circumstances. In listing the factors to be considered, the trial court expressly told the jury that one circumstance it could consider was "whether or not defendant intended to kill the victim." The court was correct. Defendant's intent to kill or lack thereof was one of the circumstances of the crime.

The photographs also illustrated the pathologist's opinion as to the cause of death based on the manner in which the rope was tied around the victim's neck. Both photographs were shown to the pathologist who performed the autopsy and one was shown to the criminologist who attended the autopsy. Both of these witnesses testified that the photographs supported their conclusions as to how the rope was tied around the victim and the manner in which the victim died. The pathologist testified particularly about certain marks made by the rope around the victim's neck, concluding that the cause of death was ligature strangulation caused by an "outside force" pulling on the ropes and in wrapping the ropes around the victim's neck, as opposed to muscle flexion by the victim.

The photographs were also highly relevant to another circumstance of the crime: the extreme callousness and cruelty with which the innocent and defenseless 12-year-old victim was treated and killed. It is difficult to imagine evidence going more directly to the ultimate question a jury must answer in a death penalty trial—whether death or life imprisonment without possibility of parole is the appropriate punishment. This is especially true in a case like this in which the manner in which the victim was hog-tied was simply indescribable in mere words. Thus, it has often been held that " '[p]hotographs which disclose the manner in which a victim was wounded are "relevant on the issues of malice [citations] *and aggravation of the crime and the penalty* [citations]." ' " (*People* v. *Milner* (1988) 45 Cal.3d 227, 247 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Fields, supra*, 35 Cal.3d 329, 372; see also *People* v. *Montiel* (1985) 39 Cal.3d 910, 924 [218 Cal.Rptr. 572, 705 P.2d 1248].)

■ Defendant's second contention—that the trial court did not weigh probative value against undue prejudicial effect—is based on the fact that *the trial court did not expressly state on the record that it had weighed undue prejudice against probative value in admitting the two photographs.* Defendant relies on *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1,

609 P.2d 468], which held the record must affirmatively show that the trial judge did in fact weigh undue prejudice against probative value. In *Green,* we noted that "the reason for the rule is to furnish the appellate courts with the record necessary for meaningful review of any ensuing claim of abuse of discretion; an additional reason is to ensure that the ruling on the motion 'be the product of a mature and careful reflection on the part of the judge,' i. e., to 'promote judicial deliberation before judicial action' (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 113 . . . [requirement of written reasons for order granting new trial])." (*People* v. *Green, supra,* 27 Cal.3d at p. 25.) In this case the record does affirmatively show the trial court weighed undue prejudice against the probative value of the photographs. Although the trial court did not expressly state it had weighed the two factors, the reason for their admission—their overwhelming probative value on the question of penalty—is manifest, and the fact that the court excluded one of the photographs demonstrates the court did in fact weigh undue prejudice against probative value for there was no other basis for exclusion of the third photograph. (See *People* v. *Fields, supra,* 35 Cal.3d 329, 373; *People* v. *Parks* (1973) 32 Cal.App.3d 143, 155 [108 Cal.Rptr. 34].)

H. *Claimed instructional error.*

1. *"Extreme" mental or emotional disturbance; intoxication.*

■ The court instructed the jury in the statutory language that they should consider whether "the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance" (§ 190.3, factor (d)), and "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects [*sic*] of intoxication" (§ 190.3, factor (h)). Defendant urges such language could be understood to imply that a mental illness such as pedophilia could not be considered unless it was "extreme" or destroyed the defendant's capacity to appreciate the criminality of his conduct or to conform to legal requirements.

We have indicated in other decisions, however, that no such mistaken implication is reasonably inferred if the jury understood it should consider defendant's background and mental condition, including less-than-extreme mental illness. (See, e.g., *People* v. *Odle, supra,* 45 Cal.3d 386, 419.) In this case the court expressly instructed the jury that under section 190.3, factor (i) they could consider the defendant's health, family background, and personal history, and under section 190.3, factor (k) could consider anything else offered by defendant in mitigation of the penalty. In light of these

instructions there is no reasonable possibility that the jury failed to consider the evidence of defendant's mental illness and, thus, no error.

### 2. *Definition of "mitigating."*

██ Defendant further objects to the court's instruction defining mitigating circumstance "as that which does not constitute a justification or excuse of the offense in question, but which in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability." It is true that in *People* v. *Lanphear* (1984) 36 Cal.3d 163, 165 [203 Cal.Rptr. 122, 680 P.2d 1081], we found an instruction directing the jury to consider circumstances which " 'in fairness and mercy, must be considered in extenuating or reducing the degree of moral culpability' " insufficient to cure the court's error in instructing the jury not to consider sympathy. (*Id.* at p. 169.) However, the instructions in the present case expressly directed the jury to consider sympathy, as well as "defendant's educational, health, and family background[, t]he defendant's personal history and potential to contribute to mankind." We perceive no error.

### 3. *"Shall" impose a penalty of death.*

██ The trial court instructed the jury in the statutory language: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant contends this instruction together with the prosecutor's argument misled the jury into returning a death verdict without determining that death was the appropriate punishment for his crime. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 541-544 [220 Cal.Rptr. 637, 709 P.2d 440].) We do not agree.

The court further instructed: "It is the combined weight of the aggravating circumstances, measured against the combined weight of the mitigating circumstances which is determinative. You are not to merely count up the numbers of circumstances on either side. . . . The weight to be given to the circumstances in mitigation and aggravation is a matter for you to decide." The prosecutor, speaking to a new jury, devoted most of his argument to reviewing the evidence of defendant's guilt. When he turned to the appropriate penalty, he told the jury it should balance the aggravating factors— the circumstances of the crime, and the two prior convictions—against whatever mitigating evidence defendant produced, and if the aggravation outweighed mitigation, return the death penalty.

Here, there were none of the comments that have concerned the court in some other cases: this jury was not told that it was merely a finder of fact, that the law had determined the penalty, or that the jury should not

concern itself with the appropriateness of that penalty. The instructions on the determination of penalty in this case were more favorable to the defendant than in any case we have encountered applying the 1978 death penalty law, and the prosecution argument was unusually restrained. There is no reasonable basis for questioning the manner in which the jury arrived at its verdict.

4. *Failure to delete inapplicable statutory factors.*

■ Defendant contends the court erred in instructing the jury it could consider all the statutory factors in aggravation and mitigation without deleting those that the court determined were inapplicable. Defendant is incorrect. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].)

5. *Failure to give unanimity instruction regarding uncharged offenses.*

■ Defendant urges the court's error in permitting the jury to hear evidence of prior uncharged offenses was exacerbated by the court's failure sua sponte to instruct the jury that an uncharged offense could only be considered if the jury unanimously agreed that defendant had committed the offense. As concluded earlier, the court did not err in informing the jury which uncharged offenses it could consider if proved beyond a reasonable doubt. As to unanimity, defendant is simply incorrect. No unanimity instruction is required in respect to uncharged prior criminal offenses. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 773-774; accord, *People* v. *Miranda, supra,* 44 Cal.3d 57, 99.) The jury was told, of course, that its verdict as to penalty must be unanimous. (See *People* v. *Ghent, supra; People* v. *Miranda, supra.*)

I. *Cruel and unusual punishment.*

■ Defendant argues that imposition of the death penalty upon him is cruel and unusual punishment, calling our attention to a number of allegedly more heinous murders in which the defendant did not receive the death penalty. We do not undertake the kind of intercase proportionality review defendant seeks (*People* v. *Karis* (1988) 46 Cal.3d 612, 649 [250 Cal.Rptr. 659, 758 P.2d 1189]) and there is no constitutional obligation to do so. (*Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

■ Under the California Constitution, article I, section 17, we have reviewed death penalty decisions to determine whether they impose cruel or

unusual punishment because the verdict of death was grossly disproportionate to the defendant's personal culpability. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 488-489 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Bean* (1988) 46 Cal.3d 919, 957-958 [251 Cal.Rptr. 467, 760 P.2d 996].) But defendant's culpability here is immense. He forcibly sodomized and killed a boy of 12 who was innocently trying to sell him a newspaper subscription, leaving him or his dead body hog-tied like an animal in brush by the side of a road in a rural area. In addition, defendant had previously been convicted of forcible oral copulation and sodomy of a young boy at knife point. Still earlier he had been convicted of child molestation.

■ Defendant urges that imposition of the death penalty in his case would be cruel and unusual punishment because he is a pedophile, which condition he classifies as a mental disease or defect, and he had used alcohol and other drugs on the day of the crime. The jury was well aware of the testimony that defendant was a pedophile and that he used alcohol and possibly other drugs. But the jury, which acts as the conscience of the community in determining the appropriate penalty, found these circumstances were outweighed by the circumstances of the crime and defendant's prior crimes, and concluded death was the appropriate penalty. The trial court determined on the statutory motion for modification of the judgment that the jury's verdict was not contrary to the evidence as reweighed by it nor contrary to law; i.e., among other things, the verdict was not cruel or unusual. The trial court was quite correct. Defendant's conduct was purposeful and deliberate. His voluntary use of alcohol or other drugs did not serve to reduce substantially his culpability absent evidence of functional impairment. Neither did his asserted mental condition of pedophilia.

First of all, there is no evidence that, and defendant does not suggest that, pedophilia impels one to commit murder. Secondly, the implication inherent in the assertion of defendant's pedophilia is that a pedophile has no alternative but to sexually assault innocent children to satisfy his lust. Even were that the case, society is not compelled to suffer forcible sexual predations upon its children by depraved repeat offenders. The United States Supreme Court recently rejected a similar contention with respect to mentally retarded persons in *Penry* v. *Lynaugh* (1989) 492 U.S. __, __ [106 L.Ed.2d 256, 289-290, 109 S.Ct. 2934, 2956]: "In essence, Penry argues that because of his diminished ability to control his impulses, to think in long-range terms, and to learn from his mistakes, he 'is not capable of acting with the degree of culpability that can justify the ultimate penalty,' [citation] . . . ." The Supreme Court held that mental retardation alone did not vitiate the need for individualized consideration of personal responsibility, and that some mentally retarded persons do not lack the cognitive, volition-

al or moral capacity to act with the degree of culpability associated with the death penalty. And, contrary to defendant's premise, there are in fact alternatives provided by society to a pedophile. He may seek treatment for his condition and if all else fails he may commit himself to a psychiatric facility either on a voluntary or involuntary basis. (See Welf. & Inst. Code, §§ 6000 et seq., 5000 et seq. [see, e.g., Welf. & Inst. Code, §§ 5150 et seq., 5250 et seq., 5300 et seq.].)

 Finally, defendant may be understood to argue that the death penalty is cruel or unusual in his case because he did not intend to kill the victim. As to the actual killer in a felony murder, intent to kill is not legally required as a prerequisite to imposition of the death penalty. (*Tison* v. *Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139, 107 S.Ct. 1676]; *People* v. *Anderson, supra*, 43 Cal.3d 1104, 1146-1147.) Moreover, defendant's claim he did not intend to kill the victim here is just that—defendant's claim. The record contains strong evidence that he did intend to kill. The record would support a finding the victim was sodomized and then killed in defendant's apartment. Given the cause of death, such a killing would almost have had to be intentional. The record would also support a finding that the killing occurred elsewhere before the victim's body was dumped in a rural area. Such a killing would likewise almost certainly have been intentional. Defendant's claim, that the victim was still alive when he was dumped, hog-tied, in brush off the side of the road in a rural area and that his death must have occurred thereafter accidentally, is belied by defendant's subsequent conduct of calmly returning to his apartment to carry on his life as usual. If he knew the victim was still alive, he also knew the victim would be able to identify him and lead police to his apartment if he were discovered shortly. The logical inference to be drawn from defendant's subsequent conduct is that defendant knew the victim was dead because he had already killed him before dumping his body.

The penalty of death in this case does not constitute either cruel or unusual punishment.

## V. CONCLUSION

No reversible error having been demonstrated, the convictions and the judgment of death are, and each is, affirmed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Eagleson, J., concurred.

Appellant's petition for a rehearing was denied March 29, 1990.