Filed 3/18/13  P. v. Porteous CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C064606 |
| Plaintiff and Respondent, | (Super. Ct. Nos. CM029144, CM029772) |
| v. | |
| RACHAEL ANNE PORTEOUS, | |
| Defendant and Appellant. | |

In Case No. CM029144, defendant Rachael Anne Porteous entered a negotiated plea of no contest to assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and misdemeanor driving under the influence (Veh. Code, § 23152, subd. (a)).  (Further undesignated section references are to the Penal Code.)

In Case No. CM029772, a jury convicted defendant of first degree murder (§ 187) and found she used a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)).  The trial court thereafter found defendant committed the murder while released on bail (§ 12022.1) and suffered a prior serious felony conviction (§ 667, subd. (a)(1))

1

and a prior strike (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)).  In a separate trial, the jury found defendant sane at the time of the offense.

Defendant was sentenced on the assault conviction to the upper term of four years.  For the murder, defendant received an indeterminate term of 25 years to life, doubled to 50 years to life under the three strikes law, plus aggregate enhancements of eight years.

She appeals contending, in case No. CM029772:  (1) the trial court erred in denying her motion to suppress statements made to police following her arrest that were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*); (2) the court improperly diluted the meaning of "deliberation" in clarifying the jury instruction on first degree murder; (3) the court improperly admitted testimony in the sanity trial regarding statements she made to a psychologist after her arrest that were both involuntary and elicited in violation of *Miranda*; (4) the jury was not properly instructed on the legal standard for insanity; and (5) the victim restitution order is ambiguous and must be clarified.  In case No. CM029144, defendant contends (6) certain fines and fees imposed by the court are improper.

The People concede points (5) and (6) and agree the abstracts of judgment must be amended.

We agree with defendant that the trial court improperly diluted the meaning of "deliberation" in case No. CM029772, for purposes of first degree murder.  And because we find such error was not harmless under the circumstances, we shall reverse defendant's first degree murder conviction.  As for the sanity verdict, we find any possible evidentiary or instructional errors were harmless under the circumstances.

FACTS AND PROCEEDINGS

Case No. CM029144

On July 10, 2008, defendant was under the influence of methamphetamine and arrived at a home on B Street in Oroville.  During an altercation between defendant and

2

another person, defendant got in her car, accelerated it toward the other person, and hit the person and his car with her car.

Case No. CM029772

On the evening of October 20, 2008, defendant arrived at the home of her mother, Theresa S. Residing with Theresa at the time were her daughter and defendant's sister, Alicia S., Alicia's boyfriend, Bryan H., and three of defendant's children, including J.G.

At approximately 10:00 p.m. that evening, Alicia and Bryan went to bed. At or around 11:50 p.m., J.G. departed for work. At the time, defendant was in the living room of the residence and Theresa was in her bedroom upstairs.

At approximately 2:00 a.m. the next morning, Alicia and Bryan got up to use the bathroom. Alicia saw lights coming from upstairs and went to investigate. She found defendant in Theresa's bedroom walking around the bed. She also saw blood on the bed. Alicia grabbed defendant, shook her and asked what she had done. Defendant said she did not do anything. Alicia then saw Theresa lying on the floor half in and half out of a closet with blood on her.

Alicia screamed and ran to her mother. Theresa was still alive and told Alicia to get defendant out of the room and that defendant was trying to kill her. Bryan, who had come to the room in response to Alicia's scream, called 911 and gave the phone to Alicia. Alicia spoke to the operator and then she and Bryan forced defendant out of the room. During the 911 call, defendant could be heard saying, "Mom you know, I didn't do that."

Theresa had received 10 stab wounds, nine on her back and one on her neck. One of the back wounds penetrated Theresa's chest wall, fractured a rib and entered her lung. She later died from loss of blood due to the stab wounds.

Responding officers found a wooden sword with blood on it against the wall in the closet of Theresa's bedroom. Theresa told the officers her daughter had stabbed her. The

sword was one of several owned by J.G., who used them for martial arts training. J.G. had previously shown defendant how to use them.

At approximately 5:00 a.m. the morning of the killing, the police found defendant nearby. She had a "vacant" look and appeared to be "spaced out." Defendant was taken to the police station, read her *Miranda* rights and interviewed. During the interview, defendant admitted stabbing her mother, explaining that she "had to." Defendant said she was tired of seeing her mother in pain. Defendant also said she had been thinking about killing her mother for days.

Defendant was charged with first degree murder and entered pleas of not guilty and not guilty by reason of insanity. Trial was bifurcated and, in the guilt phase, the jury returned a verdict of guilty. Following a sanity trial, the jury found defendant sane at the time of the offense. Defendant was thereafter sentenced as previously indicated.

DISCUSSION

I

*Motion to Suppress Defendant's Statements to Police*

Defendant contends the trial court erred in denying her motion to suppress statements she made to police in an interview following her arrest. She argues the statements were obtained without a knowing and voluntary waiver of her *Miranda* rights and after she invoked her right to remain silent.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This privilege protects an accused from being compelled to testify against himself or to provide evidence of a testimonial or communicative nature. (*Schmerber v. California* (1966) 384 U.S. 757, 761 [16 L.Ed.2d 908, 914].) In recognition of this Fifth Amendment protection, *Miranda* prohibits custodial interrogation unless the suspect "knowingly and intelligently has waived the right to remain silent, to the presence of an

4

attorney, and to an appointed counsel in the event the suspect is indigent." (*People v. Sims* (1993) 5 Cal.4th 405, 440.)

A *Miranda* waiver must be knowing, intelligent *and* voluntary. (*Colorado v. Spring* (1987) 479 U.S. 564, 573 [93 L.Ed.2d 954, 965].) There are two distinct dimensions to this requirement: " 'First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " (*Ibid.*, quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421].)

Where a defendant challenges her statements as coerced, we view the totality of the circumstances surrounding the statements to determine independently whether the prosecution has met its burden and proved that the statements were voluntary. (*Arizona v. Fulminate* (1991) 499 U.S. 279, 285-286 [113 L.Ed.2d 302, 315]; *People v. Thompson* (1990) 50 Cal.3d 134, 166, disapproved on other grounds as stated in *Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 829.) In making that determination, we consider factors such as the length of the interrogation, its location, its continuity, and the defendant's sophistication, education, physical condition and emotional state. (*People v. Williams* (1997) 16 Cal.4th 635, 660; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 209.) "[A]ny factual findings by the trial court as to the circumstances surrounding an admission or confession, including ' "the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard. [Citation.]" (*Williams,* at p. 660.)

Defendant was arrested on the morning of the offense and was interviewed at the police station by Detective Jason Barkley at approximately 6:13 a.m. The police

5

attempted to create a video recording of the interview, but this failed due to technical difficulties. Barkley himself recorded the first part of the interview, which included his explanation to defendant of her *Miranda* rights. That recording is in the appellate record. The People have provided the following transcription of the relevant portion of that recording, which defendant does not contest:

"[Barkley]: Okay. How about I read you your rights and you tell me if you understand those?

"[Appellant]: Okay.

"[Barkley]: Okay. You have the right to remain silent. Anything you say may be used against you in court. Do you understand that?

"[Appellant]: Like I can be in trouble?

"[Barkley]: Well what it means is that, um, you don't necessarily have to talk to me. That um, but if you do choose to talk to me it could--it could what you say, it could go to court.

"[Appellant]: (Unintelligible).

"[Barkley]: Does that make sense?

"[Appellant]: Yeah.

"[Barkley]: You sure?

"[Appellant]: Mm-hmm.

"[Barkley]: Huh?

"[Appellant]: I understand.

"[Barkley]: Okay. Um, is there any part of the . . .

"(Unintelligible).

"[Barkley]: Well we're going to talk about that. Um, can you--can you tell me back what--what I just said? Um . . .

"[Appellant]: I have the right to remain silent.

"[Barkley]: Okay. What does that mean to you?

"[Appellant]:  (Unintelligible).

"[Barkley]:  Okay.  And if you do talk . . .

"[Appellant]:  Mm-hmm.

"[Barkley]:  . . . it could possibly end up in court.  You understand that?  Like the things that you say may end up in court.  You understand?

"[Appellant]:  Oh.

"[Barkley]:  If something that was ever to go to court . . .

"[Appellant]:  (Unintelligible).

"[Barkley]:  You understand?

"[Appellant]:  If I go to court for something . . .

"[Barkley]:  Mm-hmm.  What you tell me could be used.  You understand?

"[Appellant]:  Okay (unintelligible).

"[Barkley]:  Okay.

"[Appellant]:  (Unintelligible).

"[Barkley]:  You have the right to the presence of an attorney before or during any questioning, if you want.

"[Appellant]:  Uh-huh.

"[Barkley]:  Do you understand that?

"[Appellant]:  Yeah.

"[Barkley]:  Okay, can you tell me what that means?

"[Appellant]:  Mmm, um . . . um, like I can have an attorney present.

"[Barkley]:  Okay with a lawyer during questioning if you want.  Do you understand that?

"[Appellant]:  Uh-huh.

"[Barkley]:  Okay.  If you can't afford an attorney, one will be presented to you free of charge . . .

"[Appellant]:  Uh-huh.

7

"[Barkley]: . . . by the court before or during any questioning if you want.

"[Appellant]: Okay.

"[Barkley]: Do you understand that?

"[Appellant]: Yes.

"[Barkley]: Okay. Is there any part of that, what I just told you, that you don't understand or that you have questions about?

"[Appellant]: Mm-mm.

"[Barkley]: So you think you understand what I'm talking about?

"[Appellant]: Kind of.

"[Barkley]: Okay."

Defendant contends the foregoing exchange demonstrates she did not in fact understand her *Miranda* rights. In particular, defendant cites her response, "Oh," to the statement by Barkley that anything she said could be used in court, and her final response that she "[k]ind of" understood what Barkley was telling her.

In *People v. Cruz* (2008) 44 Cal.4th 636 (*Cruz*), the defendant was read his *Miranda* rights, asked if he understood them, and answered, " 'more or less.' " The interviewer then repeated the warnings and, after each, the defendant indicated he understood. (*Cruz*, at p. 666.) The Supreme Court found no *Miranda* violation under these circumstances. (*Cruz,* at pp. 668-669.)

Defendant contends the present matter is the converse of *Cruz* because, after the defendant in *Cruz* indicated he understood his *Miranda* rights " 'more or less,' " the officer repeated the admonitions and elicited further responses from the defendant that he understood. Here, after defendant said she "[k]ind of" understood what Barkley was telling her, Barkley did not repeat the admonitions or obtain assurances from defendant that she understood.

But, in *Cruz*, the high court rejected the defendant's suggestion that his statement to police that he " 'more or less' " understood the admonitions was " 'an expression of

8

confusion, not understanding.' " (*Cruz, supra,* 44 Cal.4th at p. 668.) And there is no indication in the opinion that the interviewing officer was *required* to repeat the admonitions at that point. Rather, the court looked at the totality of the circumstances, including the fact there was no coercion, intimidation or trickery by the officer, and concluded the defendant's waiver was voluntary. (*Id.* at pp. 668-669.)

In the present matter, unlike *Cruz,* Barkley first obtained assurances from defendant that she understood each of her *Miranda* rights individually. Defendant repeated to Barkley that she had the right to remain silent and stated she understood anything she said could be used against her in court. Defendant indicated she understood she had the right to an attorney and that, if she could not afford an attorney, one would be provided for her at no charge. Finally, Barkley asked if defendant understood what he was talking about and she said, "[k]ind of." As in *Cruz,* this last response did not necessarily signify confusion or lack of understanding, especially given defendant's earlier responses. At the suppression hearing, Barkley testified that it appeared defendant was trying to make him believe she "was more confused than she was." The trial court concluded defendant had "freely, knowingly, and voluntarily" waived her *Miranda* rights. Based on the totality of the circumstances, including lack of any coercion, intimidation or the like, and defendant's overall responses to Barkley's questions regarding defendant's rights, substantial evidence supports that conclusion.

Defendant contends she nevertheless invoked her right to remain silent during the course of the interview, but Barkley violated her *Miranda* rights by continuing to question her. At the suppression hearing, Barkley testified that, at one point in the interview, defendant became emotional and was tearing up. She stated: "I don't want to talk right now." It appeared to Barkley that defendant needed a break and they went outside for approximately 10 minutes. After a while, Barkley continued to question her.

9

The trial court concluded defendant had not invoked her right to remain silent but instead indicated a desire to take a break from questioning. We find this conclusion supported by the evidence.

A suspect desiring to invoke her right to remain silent must do so unambiguously (*Berghuis v. Thompkins* (2010) __ U.S. __ [176 L.Ed.2d 1098, 1110-1111]; *People v. Martinez* (2010) 47 Cal.4th 911, 947-948), and this is especially so where the suspect previously waived such right (*Martinez*, at p. 948). Defendant here did not unambiguously assert her right not to be questioned further. Instead, she indicated she did not want to talk "right now."

Defendant contends the present matter is comparable to *People v. Peracchi* (2001) 86 Cal.App.4th 353 (*Peracchi*). It is not. In *Peracchi*, the interviewing officer read the defendant his *Miranda* rights and asked if the defendant wished to speak with him. The defendant answered: " ' "At this point, I don't think so. At this point, I don't think I can talk." ' " (*Peracchi*, at p. 358.) The officer asked why, and the defendant said: " ' "I just feel like my mind is not clear enough to discuss this. My mind is not clear enough right now. I need to be able to think. Right now isn't a good time." ' " (*Ibid.*) The officer pressed, and the defendant repeated that he did not want to discuss the matter at that time. (*Id.* at p. 359.) On these facts, the Court of Appeal concluded the defendant had unambiguously invoked his right to remain silent. (*Id.* at p. 360.) The court explained that, while the defendant's original response was ambiguous, his later responses sufficiently clarified his desire not to talk with the officer at that time. (*Id.* at p. 361.)

In the present matter, unlike *Peracchi*, defendant initially agreed to talk to Barkley. Only later did she say she did not want to talk "right now." This statement, standing alone, is ambiguous as to whether defendant wanted to cease the interview altogether or just take a break. She made no further statements in that regard. We conclude substantial evidence supports the trial court's factual determination that

10

defendant had not invoked her right to remain silent.  Hence, the trial court did not err in admitting testimony regarding defendant's further statements to Barkley.

II

*Instructions on the Meaning of "Deliberation"*

The jury was instructed on first degree murder pursuant to CALCRIM No. 521 as follows:

"Murder comes in two degrees.  If you decide that the defendant has committed murder, you must decide whether it is murder of the first degree or second degree.

"The defendant is guilty of first degree murder if the People have proved that she acted willfully, deliberately and with premeditation.  The defendant acted willfully if she intended to kill.  Defendant acted deliberately if she *carefully weighed* the considerations for and against her choice and knowing the consequences, decided to kill.

"The defendant acted with premeditation if she decided to kill before committing the act that caused death.  The length of time a person spends in considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  Amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.

"A decision to kill made rashly and impulsively and without *careful consideration* is not deliberate and premeditated.  On the other hand, a cold calculated decision to kill can be reached quickly.  The test is the extent of the reflection, the length of time is not determinative.  All other murders are of the second degree.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the People have not met this burden you must find the defendant not guilty of first degree murder."  (Italics added.)

The jury was also instructed on mental disease or defect and how this might impact the mental states necessary for first degree murder.  The jury was told:

11

"[Y]ou've heard evidence that the defendant may have suffered from a mental disease or defect. You may consider this evidence only for the limited purpose of deciding whether at the time of the alleged charged crime the defendant acted with the required intent or mental state, that is the mental state or intent required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent and mental state. If the People have not met this burden, you must find the defendant not guilty of murder.

"The mental state required for murder is malice aforethought. Malice aforethought can be express or implied. Express malice exists if she unlawfully intended to kill. Implied malice exists if she acted deliberately with conscious disregard for human life.

"Acting deliberately here means the *careful weighing* of the considerations for and against the choice to act regardless of the consequences to the continuation of human life.

"The issue of sanity is not before you at this time. The legal definition of sanity has not been given. It is, however, for you the jury to determine whether or not there's any evidence that the defendant suffered from a mental disease or defect at the time of the above offense or the offense in this case.

"Should the jury determine that there is such evidence or an inference of such evidence, you may consider such evidence but solely for the purpose of determining whether or not the defendant actually formed the mental states which are elements of the crime charged, to wit murder.

"Your conclusion as to whether or not there was any evidence that the defendant suffered from a mental disease or defect may be used in determining whether or not the defendant had the mental states of malice aforethought and an intent to kill and whether or not she premeditated or deliberated in connection with the offense charged which is murder." (Italics added.)

12

During deliberations, the jury sent out the following question: "Under Murder 1, please give us an expanded/further definition of 'deliberate', page 43 line 8 & 9 as stated: 'the defendant acted deliberately if she carefully weighed the considerations for and against her choice and, knowing the consequences, decided to kill.' "

The trial court consulted with the parties. The prosecution requested that the court give further clarification consistent with the CALCRIM notes and *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*). *Anderson* identified three types of evidence relevant to the issue of deliberation: (1) planning activity, (2) motive, and (3) the particular way in which the killing occurred. (*Id.* at pp. 26-27.) The defense requested instead that the court not go beyond the basic CALCRIM instructions already given.

The court brought the jury in and instructed: "[I]n the use of the word deliberately or to deliberate or deliberations, the California Law is adopting the common ordinary meaning of that word. The kind of meaning you would find in the dictionary. It's not one of those words, although it's defined in the instruction which has a special legal definition, it's the common sense ordinary meaning of the word deliberately, to deliberate or deliberation." The court then summarized its earlier instruction on the issue, that defendant "acted deliberately if she *carefully weighed* the considerations for and against her choice and knowing the consequences decided to kill." (Italics added.) The court further reiterated: "A decision to kill made rashly, impulsively or without *careful consideration* is not deliberate. On the other hand a cold calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (Italics added.)

The court asked the jury foreperson if further explanation was necessary and, if so, what is lacking. The foreperson indicated the sticking point was "[c]onsiderations, careful considerations" in the instructions. After some further discussion, the foreperson said: "I believe we're stuck in that does she have the capacity to consider" and "Mental

capacity to be able to consider and weigh the pros and cons of the action, of the act." The following colloquy ensued:

"THE COURT: All right and you do understand that if there is a lack of capacity it must be the result of a mental disease or defect, not simply intellectual capacity?

"THE FOREPERSON: Yes.

"THE COURT: All right. Well, that's a fair--you call it being stuck but that's a fair obstacle that has to be overcome before you can finish your task. The word considerations I don't think should be that obscure. It is a little vague, I grant you that, but I think it gives you the freedom as jurors with common sense to define the scope of what kind of considerations should be in someone's mind when they're faced with that choice should you be required to decide if they're acting with deliberation or not.

"THE FOREPOERSON: Okay.

"THE COURT: "I think I might say in addition, that there are probably philosophers that in reading this sentence could write a five hundred page book on considerations for or against. *I'm not trying to convey that the analysis that goes on in the mind has to be terribly profound. It's just the awareness that there are considerations for and against.*

"Because the word that's used is choice and you can't make a choice unless [you] are choosing between two things. And so the basic question when they use the word considerations is whether there was *any reflection* on opposite courses of action or opposite consequence, not whether there was deep reflection on fifty things that might come to mind." (Italics added.)

At that point, the court directed the jury to return to its deliberations. Less than two hours later, the jury returned with a guilty verdict.

Defendant contends the trial court erred in providing the jury with further instructions on the meaning of deliberation. Defendant argues the basic requirement of CALCRIM No. 521--that the jury find she *carefully* weighed the considerations for and

14

against and, knowing the consequences, decided to kill--was reduced to a requirement that the jury find there was *any* reflection on the pros and cons of killing. In other words, the requirement to find *careful* weighing was replaced with a requirement to find *any* weighing. This, defendant argues, reduced the prosecution's burden of proof and violated due process.

The People concede that a few of the words used by the court in its comments "were somewhat inartful," but argue those words did not diminish the basic requirement, repeatedly stated in the general instructions, that the jury find defendant carefully weighed the consequences of her actions.

Defendant has the better argument. A trial court "has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) But, while a trial court may understandably be reluctant to elaborate on standard instructions, the court "must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid.*) But, of course, where a trial court undertakes to explain standard instructions, it must do so accurately.

In the present matter, the parties do not dispute that the appropriate standard for a finding of deliberation is that defendant "carefully" weighed the competing considerations before deciding to kill. This is consistent with *Anderson*, where the high court explained: " 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of

15

careful thought and weighing of considerations.' " (*Anderson*, 70 Cal.2d at pp. 24-25.) The court cited its decisions in *People v. Bender* (1945) 27 Cal.2d 164, 183, and *People v. Caldwell* (1955) 43 Cal.2d 864, 869, where it stated a guilty verdict for first degree murder on a theory of premeditation and deliberation " 'is proper only if the slayer killed "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, [especially] according to a preconceived design." ' " (*Anderson*, 70 Cal.2d at p. 26.) The court further explained evidence showing nothing more than the consideration necessary to form an intent to kill will not suffice. (*Ibid.*)

While it is true here that the court's general instructions repeatedly informed the jury it must find defendant *carefully* weighed the competing considerations, it cannot be gainsaid that, in attempting to provide further explanation, the court weakened those earlier instructions by informing the jury it need only find there was *any* reflection on the opposite courses of action available to defendant. Any reflection is clearly a lesser standard than careful weighing. While we sympathize with the court's plight in trying to respond to the jury's apparent dilemma, it is nevertheless imperative that the court do so accurately in order that the jury's findings be based on the correct standard. In this instance, the court misstated the applicable standard for a finding of deliberation. In doing so, the court reduced the prosecution's burden of proof in violation of defendant's due process rights.

The People contend the error was harmless under the circumstances. An instructional error that improperly describes an element of an offense does not require reversal if the court finds it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *People v. Flood* (1998) 18 Cal.4th 470, 503.) The People argue that is the case here because, "as [defendant] concedes, the jury was not actually 'stuck' on the meaning of the word 'deliberations' but, rather, at least temporarily, on the issue of her capacity to deliberate."

16

But, as defendant correctly points out, the questions of her mental capacity and whether she deliberated are intertwined. Before determining if defendant's mental state was such as to prevent her from engaging in deliberation, it must first be determined what deliberation means. One who is mentally capable of engaging in "any" reflection on a course of action might not be capable of "careful" weighing of the pros and cons for such action.

The People make no further attempt to argue the instructional error was harmless beyond a reasonable doubt under the circumstances of this case. They make no effort to show, for example, that the evidence clearly proves defendant deliberated the murder under the appropriate standard.

It is clear from the record that the jury struggled with the question whether defendant had the requisite mental ability to deliberate. During trial, defendant's husband testified regarding her deteriorating mental condition during the weeks prior to the killing. Defendant's daughter also testified about defendant's bizarre behavior before the killing. In addition, the defense presented expert psychological testimony about defendant's worsening mental condition leading up to the killing. This included an opinion that defendant was in a psychotic state at the time of the offense.

It is also significant that, less than two hours after the court watered down the applicable standard for deliberation, the jury reached its verdict.

Based on the record before us, we cannot say the trial court's instructional error was harmless beyond a reasonable doubt. Hence, defendant's first degree murder conviction cannot stand. However, without the element of premeditation and deliberation, the jury's verdict is nevertheless sufficient to support a conviction for second degree murder. The jury was instructed on the elements for murder with malice aforethought and separately instructed on the element of premeditation and deliberation necessary for first degree murder. The trial court's error affected only this latter instruction. Hence, the jury's finding that defendant committed murder is not impacted.

17

Under these circumstances, we deem it proper to allow the People an opportunity to elect to retry defendant for first degree murder. If the People elect not to do so, defendant's conviction shall be reduced to one for second degree murder.

III

*Testimony of Dr. Wilson*

Defendant raises two issues regarding the proceedings during the sanity phase of the case. Although we reverse defendant's first degree murder conviction, that reversal has no bearing on the jury's sanity verdict, which was based on the instructions given during the sanity phase and not on any error during the guilt phase. Assuming there was no independent prejudicial error during the sanity phase, the jury's verdict that defendant was sane at the time of the offense can stand.

Defendant contends the trial court erred in admitting in the sanity trial the testimony of Dr. David Wilson, who interviewed her at the request of the district attorney's office shortly after she was arrested. Immediately before the interview, Detective Barkley read defendant her *Miranda* rights, and she indicated she did *not* want to talk to the doctor. Barkley nevertheless brought Dr. Wilson into the interview room. Barkley told defendant that she could stop the conversation at any time and suggested that they "just give it a try." Barkley introduced Dr. Wilson and then left the room. Wilson informed defendant he was not interviewing her for purposes of treatment and that her statements to him were not thereby privileged. He then proceeded to interview defendant.

Defendant argued at trial that her statements to Dr. Wilson were obtained in violation of *Miranda*. She also raised other objections not relevant here. The trial court indicated it did not believe *Miranda* was applicable to the matter, because Dr. Wilson would not be testifying about incriminating statements made by defendant during the interview but about his observations and impressions of defendant. The court analogized

18

the evidence to "fingerprints, DNA testing, that type of thing." However, the court further indicated that, if it were to rule on the *Miranda* issue, it would conclude the advisements were inadequate and that defendant's waiver was not freely, knowingly and intelligently made. In other words, there had been a *Miranda* violation.

Wilson thereafter testified that defendant was responsive to his preliminary questions and did not demonstrate any psychotic behavior. He opined that defendant did not meet the legal test for insanity. In Wilson's opinion, defendant had the capacity to understand the quality of her acts and to tell the difference between right and wrong. He further opined defendant met the criteria for borderline personality disorder but it could not be determined if she suffered either from Axis I bipolar disorder or a methamphetamine-induced disorder which, he indicated, closely resemble each other.

The People concede the introduction of Dr. Wilson's testimony violated defendant's *Miranda* rights. However, the People argue introduction of the testimony was not prejudicial to defendant. According to the People: "[W]hile Dr. Wilson's testimony was beneficial to the prosecution, it was even more beneficial to appellant. Wilson's opinion that appellant was sane at the time of the crime was merely cumulative to the opinions of the other two prosecution experts, both of whom were appointed by the court, and Wilson's concession that appellant might be properly diagnosed with the Axis I mental disease or defect of a bipolar disorder provided some corroboration to the defense expert on a hotly disputed point that was crucial to any jury verdict that appellant was insane at the time of the crime."

Defendant disagrees that Dr. Wilson's testimony was not prejudicial. She asserts Dr. Wilson was the only mental health practitioner to have interviewed her immediately after the crime, at a time when any psychotic condition that existed during the crime might still be present. She further argues the prosecution relied on Dr. Wilson's testimony. According to defendant: "[The prosecutor] argued that [defendant] exhibited no psychosis on the day of the murder and Dr. Wilson testified that [defendant] was not

19

legally insane." Defendant further asserts: "The prosecutor argued that [defendant] did not tell Dr. Wilson that she was having any delusions and that Dr. Wilson did not notice any delusions or hallucinations."

Assuming *Miranda* applied to Dr. Wilson's testimony about his impressions of defendant (see *People v. Ghent* (1987) 43 Cal.3d 739, 750; *People v. Rucker* (1980) 26 Cal.3d 368, 386-387, 390-391), we agree with the People that admission of the testimony was harmless beyond a reasonable doubt under the circumstances. As presented by the expert testimony, the question here was whether defendant suffered from an Axis I bipolar disorder which rendered her legally insane, as the lone defense expert testified, or some other condition not amounting to legal insanity, such as a substance-induced condition that mimics bipolar disorder or a personality disorder, as the prosecution's experts testified. As we shall explain, Dr. Wilson added little to the testimony of the other two prosecution witnesses and did not foreclose the possibility that defendant suffered from a bipolar disorder, as the defense expert testified.

The defense expert, Dr. Kevin Dugan, testified that certain testing of defendant revealed the presence of psychotic features, delusions and hallucinations. He opined that defendant suffers from a chronic bipolar I disorder, the severity of which depends upon whether she is taking her medications or is instead using street drugs. Dr. Dugan further opined defendant did not understand the wrongfulness of her conduct and she met the legal definition of insanity.

The first prosecution expert to testify was Dr. Kent Caruso, who indicated defendant's history reveals a substance-induced emotional disorder under Axis I, which creates symptoms consistent with bipolar disorder. He further opined there was no evidence defendant was psychotic, delusional or experiencing hallucinations at the time of the offense. According to Dr. Caruso, bipolar disorder is relatively rare and where, as here, there is a history of methamphetamine addiction, it cannot be determined if the person's symptoms are the result of that addiction or a bipolar disorder.

20

Dr. Wilson was the next prosecution expert to testify. He indicated he met with defendant the day following the killing and she did not demonstrate any psychotic behavior. According to Dr. Wilson, defendant did not meet the legal definition of insanity because she had the capacity to understand the quality of her acts and to tell the difference between right and wrong. Like Dr. Caruso, Dr. Wilson indicated the symptoms of a methamphetamine-induced condition closely resemble those of bipolar disorder and it is difficult to determine which condition applies to defendant. Dr. Wilson further opined defendant met the criteria for a borderline personality disorder.

The final prosecution expert was Dr. Deborah Schmidt. Dr. Schmidt opined that defendant did not have a settled condition preventing her from understanding what she was doing or from being able to distinguish between right and wrong. In other words, according to Dr. Schmidt, defendant was not legally insane. Dr. Schmidt further opined defendant suffered from a general anxiety disorder and an alcohol and cannabis dependence disorder. However, Dr. Schmidt did not rule out bipolar disorder altogether.

Thus, all three prosecution experts testified defendant suffers from a methamphetamine-induced condition. However, because the symptoms of such condition closely resemble those of bipolar disorder, the experts could not rule out the possibility that defendant suffers from the latter condition. Nevertheless, all three testified defendant does not meet the legal definition of insanity. In addition, Dr. Schmidt opined defendant suffers from an anxiety disorder and Dr. Wilson opined defendant suffers from a borderline personality disorder. Hence, the testimony of any one of these three experts added little to that of the other two.

Defendant argues the testimony of Dr. Wilson was important because he was the only witness to see her shortly after the murder and indicated defendant was responsive to questions and did not demonstrate any psychotic behavior. That interview occurred sometime after 5:00 p.m. the next day. However, there is nothing in this record to suggest any psychotic behavior that may have been active at the time of the offense

would still have been operative more than 12 hours later. On the contrary, in the interview of defendant by Detective Barkley around 6:00 a.m. that day, there is no indication of any such behavior.

Defendant also overstates the extent to which the prosecutor relied on the testimony of Dr. Wilson. The prosecutor's argument to the jury that defendant exhibited no psychosis the day of the murder is not necessarily a reference to Dr. Wilson's testimony. The percipient witnesses who observed defendant's actions leading up to and after the killing did not describe any psychotic behavior. Nor did Detective Barkley, who interviewed her even closer to the event. And while Dr. Wilson opined that defendant was not legally insane at the time of the offense, that opinion merely corroborated those of the other two prosecution witnesses. The prosecutor did mention that Dr. Wilson failed to notice any delusions or hallucinations on the part of defendant. However, there was in fact no evidence presented that defendant was delusional or hallucinating at the time of the crime. At most, the defense expert testified that defendant had suffered delusions and hallucinations *in the past*.

Thus, two other prosecution experts opined that defendant suffered from a methamphetamine-induced condition and did not satisfy the legal definition of insanity. And, because Dr. Wilson testified that the symptoms of a methamphetamine-induced condition closely resemble those of bipolar disorder, his testimony did not foreclose the possibility that defendant suffered from the latter condition. Finally, the prosecution made little use of Dr. Wilson's testimony in arguing for a finding of sanity. Under these circumstances, we conclude that if the introduction of Dr. Wilson's testimony was error, it was harmless to the outcome of the case.

Defendant independently contends the trial court erred in failing to exclude the testimony of Dr. Wilson on the basis of voluntariness. She argues the evidence clearly shows she did not wish to speak with Wilson but Detective Barkley forced her to do so

22

anyway. However, because we conclude any error in admitting the evidence was harmless, we need not decide that issue.

IV

*Insanity Instruction*

The jury was instructed on the insanity defense pursuant to CALCRIM No. 3450. As given by the court, the instruction read in relevant part:

"You have found the defendant guilty of murder. Now you must decide whether she is, was legally insane when she committed the crime or crimes. The defendant must prove that it is more likely than not that she was legally insane when she committed the crime. The defendant was clearly insane if, number one, when she committed the crime she had a mental disease or defect and number two, because of that disease or defect, she did not know or understand that [*sic*] the nature and quality of her account [*sic*] or did not know or understand that her act was morally or legally wrong.

"*None of the following qualify as a mental disorder or defect for purposes of an insanity defense. A personality disorder, an adjustment disorder, an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.* If the defendant suffered from a settled mental disease or defect caused by the long term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A settled mental disease or defect is one that remains after the effect of the drugs or intoxicants has worn off." (Italics added.)

Defendant contends the italicized portion of the foregoing instruction incorrectly prevented the jury from using the existence of a personality disorder, an adjustment disorder, or an abnormality of personality or character as one factor in determining if she was insane at the time of the murder. Defendant argues the instruction should instead have said that none of those three things, *standing alone*, qualifies as a mental disease or

23

defect. According to defendant, the jury here could have concluded she suffered from both a personality disorder brought on by chronic methamphetamine use and a bipolar disorder and that the combination of the two rendered her legally insane at the time of the murder. However, she argues, the instruction prohibited the jury from considering the personality disorder for that purpose.

Defendant cites former section 25.5, which read in relevant part: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact *solely* on the basis of a personality disorder or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances. . . ." (Italics added.) Defendant also cites the predecessor CALJIC instructions which, she argues, did not contain the error she claims.

The People contend the CALCRIM instruction did not preclude the jury from considering a bipolar disorder in tandem with a personality disorder in deciding whether defendant was insane at the time of the murder. They argue the instruction is silent on this subject, thereby neither precluding nor encouraging such consideration. The People further contend any defect in the instruction was not prejudicial to defendant, because there was no evidence defendant suffered from both a bipolar disorder *and* a personality disorder. The experts opined that she suffered from one or the other of those conditions, but none of the experts suggested both may have been present at the same time. Thus, the jury was left to decide if defendant suffered from a personality disorder brought on by chronic drug use or from the more severe bipolar disorder. If the former, the instruction explained this would not be sufficient for a finding of insanity. If the latter, this alone could have been sufficient for the jury to find defendant was legally insane at the time of the murder, at least according to the testimony of the defense expert.

Assuming, as defendant argues, CALCRIM No. 3450 is defective in failing to include language indicating that none of the various listed conditions, *standing alone*, qualifies as a mental disease or defect, we agree with the People the error was harmless in

24

this instance.  The lone defense expert, Dr. Dugan, testified that defendant suffered from chronic bipolar I disorder, the severity of which depends upon whether, at the time, she is using illegal street drugs or her medication.  He further opined defendant met the legal definition of insanity and did not understand the wrongfulness of her conduct.  However, Dr. Schmidt testified defendant suffered from "general anxiety disorder and also alcohol and cannabis dependence disorder."  Dr. Wilson testified defendant suffered from borderline personality disorder.  None of the prosecution witnesses opined that defendant also suffered from bipolar disorder.  Hence, there was no expert who testified defendant suffered from both bipolar disorder and a personality disorder, adjustment disorder, or abnormality of personality or character.  Thus, there was no occasion for the jury to decide whether the combination of a bipolar disorder and some other personality disorder rendered her legally insane.  The purported error was therefore harmless.

V

*Cumulative Error*

Because we have found reversible error in the court's explanation of the meaning of deliberate as it relates to first degree murder, and find no other error in the guilt trial, we need not consider her claim of cumulative error during that phase of the proceedings.  In the sanity phase, even if there were error in both the introduction of Dr. Wilson's testimony and the instruction on insanity, those errors would work independently of each other in this instance.  Any instructional error would not be exacerbated by the introduction of Dr. Wilson's testimony, and vice versa.  Hence, such errors would not add cumulatively.

VI

*Victim Restitution*

The trial court ordered victim restitution to the State Board of Control (Board) in the amount of $8,828.67.  However, the abstract of judgment fails to designate whether

25

victim restitution is to be paid to the victim's family or to the Board. Defendant contends this must be clarified, and the People agree. However, because we reverse defendant's first degree murder conviction, she will have to be resentenced and a new abstract of judgment prepared. Her claim is therefore rendered moot.

VII

*Fines and Fees*

In case No. CM029144, the court ordered a restitution fine of $600. However, after the parties exited the courtroom, the court ordered a second restitution fine in the amount of $100 on the DUI count.

Defendant contends this second restitution fine was improper. Section 1202.4 reads, in relevant part: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine . . . ." "[E]very case," as used in this provision, means one restitution fine may be imposed for each case filed against the defendant, not for each count alleged. (*People v. Soria* (2010) 48 Cal.4th 58, 62-63.) The People concede only one restitution fine could be imposed in case No. CM029144. We accept the People's concession and shall direct that the abstract of judgment be amended to eliminate the second restitution fine.

The trial court also ordered two court security fees of $30, for a total of $60. However, the abstract of judgment identifies a total court security fee of $60 as well as a court security fee on count 2 (the DUI) of $30. Defendant argues the abstract suggests three separate court security fees of $30 were imposed, notwithstanding that section 1465.8 authorizes a court security fee for each conviction and defendant was convicted of only two offenses. The People again concede error. We shall direct that the abstract of judgment be corrected to eliminate this second reference to a court security fee in the amount of $30.

26

DISPOSITION

In case No. CM029144, the second restitution fine in the amount of $100 is stricken. In all other respects, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to eliminate the $100 restitution fine and the reference to a court security fee in the amount of $30. As amended, the abstract should reflect a restitution fine of $600 and total court security fees of $60.

In case No. CM029772, the judgment of conviction for first degree murder is reversed. The People may, within 30 days of finality of our decision herein, move to set the matter for retrial on the first degree murder charge. Should the People elect not to do so or fail to so move in the time indicated, the trial court is directed to enter judgment convicting defendant of second degree murder. Following a retrial or waiver by the People, the court shall resentence defendant as appropriate (see *People v. Jaramillo* (1976) 16 Cal.3d 752, 760; *People v. Briggs* (1971) 19 Cal.App.3d 1034, 1037) and prepare a new abstract of judgment.


                                        HULL            , J.



We concur:



      RAYE           , P. J.



      DUARTE        , J.



27